[Civ. No. 5250. Third Appellate District.—January 25, 1935.]

STUART A. McLEOD, Plaintiff, v. YSIDRO REYES et al., Defendants; TITLE INSURANCE AND TRUST COMPANY (a Corporation) et al., Defendants and Respondents; LEONARD SLERT et al., Defendants and Appellants.

Harold E. Thomas, Byron D. Seaver, Harry M. Irwin and John C. Packard for Appellants.

Flint & MacKay, Hunsaker, Britt & Cosgrove, Cosgrove & O'Neil and Overton, Lyman & Plumb for Respondents.

PLUMMER, J.—In this action the defendants, cross-complainants and respondents Title Insurance and Trust Company, a corporation, Los Angeles Mountain Park Company, a corporation, and Castellammare Beach Corporation, a corporation, had judgment quieting title to the lands and premises claimed by them, acquired by mesne conveyances from former owners of the tracts claimed by the respective corporations, to whom the respective lots or tracts had been allotted in a partition suit prosecuted to final judgment in the District Court (now Superior Court) of Los Angeles County. From this judgment certain of the defendants have appealed.

The action as originally begun involved title to a strip of land bordering the Pacific Ocean, approximately five miles in length, and if we accept the offer to prove the average width thereof at 75 feet, included a trifle more than 45 acres. Upon this appeal only that portion of the lots fronting on the Pacific Ocean, the ownership of which was found to be in the corporations just named, is involved. The tract in dispute lies between the meander line, as run by the United States surveyors, and the Pacific Ocean. There is no controversy, however, that the United States patent carried ownership to the line of high tide, and that the survey line running along the Pacific Ocean was only a meander line, and not intended as the true boundary.

The lots of land of which the corporations above named are the respective owners, are a portion of a larger tract known as the "Rancho Boca de Santa Monica", a Spanish grant made by the Mexican government in 1839 to Francisco Marquez and Ysidro Reyes.

Pursuant to the treaty entered into between Mexico and the United States, after the conclusion of the Mexican war proceedings were instituted in 1851 to secure confirmation of title to this land. Pending the securing of a United States patent and a patent from the state of California, partition proceedings were instituted, and upon the issuance

of the patents referred to, supplemental pleadings were filed in the action just referred to, and partition had of the lands included in the Mexican grant.

Omitting courses and distances, the following excerpts from the United States patent sufficiently describes the rancho as patented by the United States government:

"Beginning at a bluff, a sharp hill which divides a canada overgrown with tule near the sea at the place known as 'Topango' Point, running thence easterly along the beach seven thousand five hundred varas to a gulch which opens in the wall or precipice formed by the sea; thence northerly four thousand varas to the point where the line passes the path leading down to the Canada de la Iglesia in a line with a small red bluff of the same canada; thence westerly along the Sierra and parallel with the coast to a point opposite the place of beginning; thence southerly to the place of beginning, containing one and one-half square leagues of land. . . .

"Beginning at a sand stone thirty-seven by twenty-five by four inches marked 'B–1', set eighteen inches deep in earth and surrounded by a mound of earth and stone eighteen inches high on the point of a sandy bluff about ten feet above high water mark to Point 'Topango' of the juridical possession, from which stone the corner of the United States Coast Survey Signal Station bears north fifteen degrees and forty-five minutes west twenty-six chains and thirty-two links distant, and the line of the coast to the west bears north seventy-one degrees west and running thence according to the true meridian the variation of the magnetic needle being fourteen degrees and thirty minutes east, along the coast of the Pacific Ocean."

The estimated number of acres included within the grant was 6,656.93. This estimate is less by some 73 acres found to be included within the patent, according to the survey made for the purposes of partition. According to the field-notes of the survey and the specific description of the lots contained both in the interlocutory and final decree of partition, the meander line along the coast of the Pacific Ocean appears to have been followed, which gives rise to the present controversy urged by appellants that the meander line was adopted and became the boundary line of the premises distributed to the grantees of the parties to whom judg-

ment was awarded in this action, and that no partition was made of the lands lying between such meander line and the line limiting the high tide of the Pacific Ocean.

It must be borne in mind the partition was ordered in 1883, at a time when the beach land was of no practical value, and therefore in making partition could not have reasonably been taken into consideration in determining the values of the respective allotments in order to make an equitable partition of the rancho.

We may also here add that while innumerable objections have been raised as to the correctness of the findings and judgment of the trial court, which have all been considered, only those deemed vital to a decision in this cause will be set forth herein.

Briefly, the determination of one question is decisive of this cause, to-wit: Did the final decree of partition heretofore referred to distribute to the allottees, grantors of the respondents herein, the lands lying between the meander line as run by the United States government, and the line of high tide of the Pacific Ocean? If so, the appellants have no right thereto.

As a secondary question the respondents claim title by adverse possession.

As a preliminary statement of facts upon which the complaint in partition was based, the supplemental pleadings set forth the issuance of a patent in 1881, as shown by the official records of the county of Los Angeles, reference to which was specifically made for a particular description of the premises in which the exterior boundaries of said rancho were finally established and determined, the parties praying that the lands and premises so patented be partitioned.

No issue is presented questioning the fact that the United States patent carried the southerly limits of the rancho to the high tide of the Pacific Ocean. The prayer of the supplemental pleading to which we have referred calls for a partition of the patented premises, which means premises having a southern boundary coincident with the high-tide line of the Pacific Ocean.

The interlocutory decree following the hearing had upon the petition for partition contains an order from which we quote the following: "It is hereby ordered and adjudged that the rights and interests of the several parties to this

action in and to the lands described and sought to be partitioned in the complaint herein are as follows,'' etc. ''It is further ordered and adjudged that partition be made of the land and premises mentioned and set forth in the complaint in this action and hereinafter described.'' The description follows the patent issued by the United States government. The interlocutory decree further ordered, as a reference thereto clearly shows, that the referees should make partition of the rancho so that each allottee would receive his fraction of the whole of said lands and premises. This language certainly would include every acre of the rancho covered by the United States patent, whether it lay inside or outside of the meander line run by the United States surveyors. Direction was also contained in the order that the referee should make provision for rights of way, etc.

We do not need to follow either the surveyor's report or the reports of the referees, further than to state that the referees had the exterior lines of the rancho resurveyed and subdivided into section lots of 640 acres, as nearly as possible; that they found that the rancho contained 73.93 acres of land in excess of the quantity mentioned in the patent. As to whether the calculations made by the United States surveyor or the survey of the referees is correct, is wholly immaterial to any issue involved herein. The survey and the report of the referees show that the starting point for making the respective allotments was station No. 17 in the survey of the exterior boundaries of the rancho, fixed by the United States surveyor as the southwest corner. This corner is just a few feet above high tide of the Pacific Ocean. This fact is shown by the following excerpt found in the partition survey, to wit: ''Beginning at a sand stone 37x25x4 marked 'B-1', set 18 inches deep in earth and surrounded by a mound of earth and stone 18 inches high on the point of a sandy bluff about 10 feet above high water mark.'' Courses and distances were run therefrom around the rancho following and along the southerly portion thereof bordering the Pacific Ocean, the line run by the surveyor corresponding with the meander line heretofore run by the United States surveyor.

Notwithstanding the fact that the pleadings, and also the decrees, both interlocutory and final in the partition proceedings, refer to the maps and plats and the United

States survey showing the boundaries of the rancho, it is nevertheless insisted by the appellants, who are heirs of the original allottees, that the southerly boundary line of the premises involved is the meander line, and not the high-tide line of the Pacific Ocean. This contention is specifically set forth in the opinion filed by the learned trial judge, to wit:

"In support of that contention it is argued that there is an irreconcilable conflict between that portion of the final decree, wherein the courses and distances of the various allotments are specified, and the balance of said decree. Accordingly, it is claimed that, under such circumstances, the courses and distances are controlling, and hence it is insisted that by confining the parcels allotted to the area embraced within the courses and distances specified in the final decree, there will be found to have been omitted from said allotments a strip of land extending the entire length of said rancho along the shore of the Pacific Ocean, and which strip originally constituted the entire beach frontage of said rancho."

No question appears to be made that the pleadings in the action sought partition of the entire rancho, and we think all the subsequent decrees must be read in the light of the relief sought in the complaint, both as originally filed and as added thereto by supplemental pleadings.

As against this purpose shown by the pleadings the contention appears to be made that the actual partition included only that portion of the rancho lying within the exterior boundaries called for in computing the acreage, which would embrace no part of the beach or sand land lying between the meander line running from point one, the beginning place for the United States survey, and station 17, the end of the meander line along the course of the Pacific Ocean, and the actual high-tide line of the ocean. The courses, distances and measurements, as we have stated, for the survey made in preparation for partition, start from station 17 at an elevation of 10 feet above high tide, and in the concluding portion of the survey running along the southerly line of the rancho follows substantially the meander line run by the United States surveyor. It may here be stated that meander lines are run from station to station, and do not pretend to follow all the sinuosities or curvatures of the shoreline bordering a body of water.

While the patents issued in this case describe the shoreline of the Pacific Ocean as the southern boundary of the tract, the meander line follows the course of the ocean for the purpose, as we shall hereinafter show, not to establish the actual boundary line of the rancho, but for the purpose of determining the actual acreage within the grant, and we think the same rule applies in partition proceedings where it is sought to partition lands among several owners so that each may have a parcel thereof corresponding in value with each and every parcel distributed to other allottees. The general government, as we shall hereinafter show, while always granting, by its patent, where navigable waters are involved, all the land lying between that which is considered of value and the high-tide line of the navigable waters, such strip is never included for the purpose of determining the amount of money to be charged for the premises conveyed.

The general course of the shoreline of the ocean does not appear to have been explained directly by any witness testifying in this case, yet the general course is readily ascertained by a study of the meander line running from station No. 1 to station No. 17 of the United States survey, being generally from the west to the east, delineating the southern boundary of the Mexican grant, and the premises included in the United States patent. It is contended by the appellants that the measurements of the different tracts allotted must start from a station on the meander line instead of from the high-tide line of the Pacific Ocean, in order that the lines run by the respective surveyors may be made to meet, and that unless the meander line is considered as the true boundary, the whole allotment is thrown into confusion and therefore the final decree of partition is void. In behalf of this contention a very lengthy argument is presented and numerous cases cited to support the position assumed that where an instrument is uncertain in its descriptions, and cannot be reconciled, it must be held void. In other words, it is argued that if the high-tide line of the ocean is considered as a southern boundary, then and in that case none of the calls in the survey setting out the different allotments can be made to meet or describe the boundaries of any of the several tracts allotted.

The same argument, if well taken, would lead to the conclusion that the United States patent also is void, and that the land lying between the meander line and the high-tide line of the Pacific Ocean never was conveyed by the Mexican grant or the United States government to the original owners through whom all the parties to this action assert title.

We may mention here that it is conceded by all of the parties hereto that the United States patent and the Mexican grant conveyed title to the disputed premises to the original Mexican grantees. In no case which has been called to our attention, and which we have been able to discover, has it been held that a United States meander line along either a stream or a navigable body of water constituted the boundary line of the premises conveyed by a United States patent, save and except where the omitted lands were of such large proportions as to indicate a fraudulent act on the part of the surveyor. Nothing of that kind appears in this case.

Assuming as correct the appellants' offer to prove the average width of the strip as 75 feet, a mathematical calculation which we have made shows that the entire five-mile strip includes only a fraction over 45 acres, as we have hereinbefore stated. This of course establishes beyond peradventure the good faith of the respective surveys along the shoreline of the Pacific Ocean, and the fact that the meander line was run as nearly as practicable to the shoreline of the ocean.

While some contention is made as to the manner in which the boundary lines should be extended so as to show the respective portions of the sand tracts to which the respective allottees whose tracts bordering on the ocean should be drawn, that question is not before us and we do not need to give any attention to the three or four methods of drawing such lines. That is an issue which could only be presented if a controversy should arise between the respective owners whose premises border on the ocean.

Again, we think it was unnecessary for the decree of partition to specifically describe by metes and bounds, the small strip of beach land to which each allottee would be entitled by reason of his allotment bordering upon the

Pacific Ocean, for the reason that section 830 of the Civil Code supplies such omission. That section reads:

"Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

The court, in making partition, as well as all of the parties thereto, must be presumed to have acted with a knowledge of the provisions of this section. Thus, when the particular lots were awarded to the grantees of the respondents herein, it carried with the award that portion of the premises in dispute, held by the trial court to belong to the respondents.

Without further elaboration, what we have said we think shows conclusively that neither the interlocutory nor the final decree of partition, making partition of Rancho Boca de Santa Monica, entered in action No. 2405, one on the sixth day of July, 1882, and the other on the fourth day of June, 1883, is either uncertain or void for any of the reasons suggested by the appellants. In making this statement we are not overlooking any of the requirements of section 764 of the Code of Civil Procedure which requires the referees to divide the property and allot the several portions thereof to the respective parties, quantity and quality relatively considered, so that each allottee may have an equitable portion thereof, designating the several portions by proper landmarks, etc. The landmarks in this case, as shown by the field-notes of the surveyor and the report of the referee, are all designated, starting from a point on the meander line of the survey made by the United States government, and not from the high-tide line, as actually constituting the southern boundary of the rancho as conveyed by the United States patent. The survey and the stakes set by the surveyor and the allotments made by the referees are in strict accordance with the provisions of the law regarding the line run from station No. 1 to station No. 17, only as a meander line and not as an established boundary line, those points and the meander line being used for the purpose of making allotments just as was used by the United States government,

and as likewise used by the United States government in selling public lands to ascertain the acreage for which a price should be charged.

In the instant case the survey and the allotments are made of lands and premises for which the general government would charge a price, and therefore could only be considered in determining the relative values of the tracts allotted.

By the provisions of section 830 of the Civil Code, *supra,* the small parcels of land lying between the meander line and the high tide of the ocean went to the allottees named in the tracts, bordering the ocean as a matter of course.

No question is presented, nor can any question be presented, that any fraud was committed in the allotments, or that at the time the allotments were made, the respective parties were not given tracts of land equal in value, as directed by the order of the court. While several cases are called to our attention by the appellants, of surveys or patents for land bordering on streams where the boundary line has been held to be coincident with the bank of the stream, and not the middle of the stream, a careful examination of those cases reveals that in each instance there appears in the description a clear and distinct limit of the boundary of the land conveyed. Thus, again, applies the provisions of section 830 of the Civil Code, *supra.* In those cases, as we have said, a different intent appears in the grant from the intent which would carry the conveyance to the middle of the stream.

We do not find that the respondents' question, that where an intent appears from the grant to limit the boundary to the bank of a stream, such intent will be enforced, and the boundary line held to be coincident with the bank of the stream, and not the middle of the stream bordering the land conveyed.

Again, if natural objects are referred to as being the limit of the boundary of the grant, those natural objects will be controlling. Here, however, there is nothing to indicate a different intent than that the high tide of the Pacific Ocean should be considered as one of the boundary lines. The interlocutory decree to which we have referred. sets forth, among other things, under the caption ''The Premises of which Partition is hereby Ordered are described as follows,

to-wit: . . . and running thence according to the true merid-
ian, the variation of the magnetic needle being 14 degrees
30 minutes east along the coast of the Pacific Ocean.'' In-
stead of a contrary intent, here is a direct and explicit state-
ment indicating that the intent of the court was to partition
lands having a boundary line coincident with the high-tide
line of the Pacific Ocean. Enforcing this quotation we may
also refer to the fact that stations No. 1 and No. 17, from
which, and to which the meander line is drawn, are both prac-
tically on the line of the high tide of the ocean.

In the recent case of *Anderson* v. *Trotter*, 213 Cal. 414 [2
Pac. (2d) 373], practically all of the cases cited by the ap-
pellants and respondents are collected and analyzed. In the
opinion in that case the court quoted from 9 C. J., page
181, as follows: ''Grants by the United States of its public
lands bounded on streams or other waters, navigable or non-
navigable, made without reservation or restriction, are to be
construed according to their effect, and according to the
law of the state in which the land lies. The general rule
adopted by both state and federal courts is that meander
lines are not run as boundaries of the tract surveyed, but
for the purpose of defining the sinuosities of the banks of
the stream or other body of water, and as a means of ascer-
taining the quantity of land embraced in the survey. The
stream, or other body of water, and not the meander line
as actually run on the ground, is the boundary, the purpose
of meander lines being merely for the benefit of the govern-
ment in ascertaining the quantity of land in the survey for
which it requires payment; and the rules adopted in the
various states as to the extent of the title of the owner of
land bounded on rivers and other bodies of water apply in
the case of land bounded on meandered waters.''

This opinion may be shortened by referring to the opinion
in *Anderson* v. *Trotter*, *supra*, for an analysis of all of the
cases necessary to be reviewed in order to reach a correct
conclusion upon the questions here being considered.
The analysis there set forth establishes beyond controversy
that a meander line, whether state or national, is not con-
sidered a boundary line, but is used only for the purposes
of determining the acreage for which a charge should be
made when the title is being transferred from the state or
general government to private parties, and also that a like

rule prevails when private parties, conveying lands bordering upon streams or navigable waters, convey to the middle of the stream or to high tide, unless a different intent is shown by the instrument of conveyance.

The cases cited in *Anderson* v. *Trotter, supra,* also show that meander lines are really run for convenience, that is, to avoid the difficulties that would be encountered, and we may say in many instances almost insurmountable objects that would be encountered if the sinuosities of shorelines must be indicated by the field-notes and included in the survey, instead of running an accessible meander line and blanketing in the omitted inaccessible strip by defining the boundary line as running along the high tide of the adjacent body of water. In the instant case we have the meander line and we also have the statement that the premises to be partitioned have a boundary line "running along the coast of the Pacific ocean".

Some question has been raised as to the referees not having provided means of ingress and egress to and from the allotted premises. This, however, we think is covered by the reference to highways mentioned in the allotments, and also the fact, as pointed out by respondents, that the traveled portion of the beach, when it has been traveled, has been along the land covered by the ebbing tide, and that during high tide no travel was possible in many places.

There is another reason why measurements should be taken from a meander line, and not from a line coincident with the high tide of the ocean at any particular time. The wash of the ocean and the shifting sands constantly change the line of high tide. While the rise and fall of the tides may be accurately measured, just how far the flood tides will encroach upon the sand beach at any particular place, at any specified time, we understand cannot be either correctly measured or accurately predicted. This is rendered true by reason of the fact that the ocean is ever at work casting up and taking away portions of the abutting sand beach. Thus, a high-tide line, if it had been established by a United States surveyor preceding the issuance of a United States patent in 1881, we may safely assume would not mark, with any degree of accuracy, the high-tide line at the date of the trial of this action in 1930. The meander line established, as herein stated, is reasonably definite and certain, as

such a line, while the high-tide line along the same premises is at all times a variable quantity. Even if the contour line of the ocean should have remained absolutely fixed from the time of the issuance of the United States patent down to the date of the trial, the omitted tract, as compared with the size of the entire tract conveyed, is so insignificant as to cause it to properly fall within the term, ''a negligible quantity'', and as we have stated, properly omitted by the referees in determining values in making the respective allotments.

The fact that the surveyor and the referees figured the respective allotments as shown by the survey made under the direction of the referees, down to a small fraction of an acre, has no bearing upon the application of the legal principle which carried with the grant of the upland the high-tide line of a bordering navigable body of water. At best, all that is exhibited is the exceeding carefulness of the surveyors and referees in making equitable partition by not taking into consideration a sand beach which at the time of the entry of the final decree of partition was of no appreciable value. Its increase in value in subsequent years has no controlling influence, any more than a discovery by one allottee that his land was more susceptible of producing a certain valuable crop than the lands awarded to a different allottee, would impugn either the motives or the justness of the acts of the referees when making partition. So far as conditions are concerned, they must be judged as of 1881–1883, and not as of 1930 or 1934.

As a further ground upon which the respondents base their right to the premises involved, it is claimed that title thereto has been acquired by prescription. As against this claim appellants' first contention is that the respondents must show actual *pedis possessio* of every particle of the lands in dispute, as the respondents did not take possession under color of title. In view of what we have said in the foregoing, this contention on the part of the appellants is untenable. When the land was conveyed by the government to the original grantees, the conveyance of the upland carried title to the line of high tide, and gave color of title not only to the upland, but also to the strip between the meander line of the survey and the high-tide line of the Pacific Ocean. Thus, if our views heretofore expressed state the

law correctly as to the issues involved herein, whenever possession was taken of any portion of the grant by the original grantees, and also when possession was taken of any portion of the allotments by the respective allottees upon partition, that possession was taken of the entire parcel of land which the law would hold as covered by a grant of the upland, and would constitute taking possession under color of title.

■ The respondents, however, introduced considerable testimony showing actual occupation, possession and dominion exercised over the premises in controversy. The trial court found that the respective respondents had exercised open, notorious and adverse possession of the parcels claimed by the respondents, respectively, and that their acts had complied with the law giving title by adverse possession.

The photographs introduced in testimony show that a number of cabins or summer-houses had been erected by the respondents, and the testimony, in addition to the photographs, shows that during the summer season cabins were rented to different persons; also that the premises were rented to campers. At times the premises were rented to moving picture concerns, sand and gravel sold from the premises, and without setting forth the testimony in detail, we think it is sufficient to support the findings of the trial court in relation to possession, and that the testimony shows that the respondents exercised such dominion and possession of the premises, and use and occupation thereof, as is ordinarily made of such lands and premises, and to which uses and purposes they are reasonably adapted.

■ The rules which are applicable here are well stated in the case of *Weyse* v. *Biedebach*, 86 Cal. App. 712 [261 Pac. 1086], as follows: "The rule is well established in California that the use and occupation requisite to adverse possession do not always require 'constant' use. (*Myers* v. *Berven*, 166 Cal. 484 [137 Pac. 260].) It is enough that the property be devoted to the ordinary use of the occupant, and temporary abandonments or periods of vacancy which evince no intention of abandonment of possession do not interrupt the possession. (*Montgomery & Mullen L. Co.* v. *Quimby*, 164 Cal. 250 [128 Pac. 402]; *Botsford* v. *Eyraud*, 148 Cal. 431 [83 Pac. 1008]; *Goodrich* v. *Mortimer*, 44 Cal. App. 576 [186 Pac. 844].) ■ Furthermore, any visible act which clearly demonstrates an intention to claim owner-

ship and possession, and either puts the legal owner upon inquiry or conveys actual notice, is sufficient. (*Franz* v. *Mendonca*, 131 Cal. 205 [63 Pac. 361].) It is not necessary that one claiming by adverse possession be in personal occupation. Possession by tenant inures to his benefit. (*Lloyd* v. *Mills*, 68 W. Va. 241 [32 L. R. A. (N. S.) 702, 69 S. E. 1094]; *Sutton* v. *Whetstone*, 21 S. D. 341 [112 N. W. 860]; *Alabama State Land Co.* v. *Hogue*, 164 Ala. 657 [51 So. 320]; *Wright* v. *Giles*, 60 Tex. Civ. App. 550 [129 S. W. 1163].)''

By stipulation of counsel and the order of this court proceedings were had in accordance with section 956a of the Code of Civil Procedure, and certified copies of deeds introduced covering a defect in the chain of title pointed out by the appellants, which renders unnecessary consideration of any alleged error of the court in relation thereto.

The judgment as to each of the respondents is affirmed.

Pullen, P. J., and Thompson, J., concurred.