[Civ. No. 12544.   First Dist., Div. One.   Jan. 31, 1944.]

F. F. FORD, Appellant, v. COUNTY OF BUTTE, Respondent.

Anthony & Rogers for Appellant.

Jack M. McPherson for Respondent.

KNIGHT, J.—This is an appeal by plaintiff from a judgment entered in defendant's favor on a cross-complaint in an action to quiet title to real property.

In 1924 plaintiff entered into negotiations with the county of Butte to sell to the county a piece of property on the Feather River. It was understood that the purpose for which the county desired to purchase the property was to erect thereon a veterans' memorial building and to provide for recreational activities in and along the river, such as swimming and boating, for veterans' organizations. The property involved in the negotiations was the eastern portion of Outside Lot 17 of the city of Oroville; and the sale was consummated in 1925. To facilitate the sale plaintiff executed a deed of conveyance, dated July 11, 1924, to the Butte County Title and Abstract Company; and thereafter, to wit, on April 7, 1925, the title company conveyed the property by deed, as of that date, to the county, and the deed was recorded on April 8, 1925. The county took possession of the property in 1925, and thereafter caused to be constructed upon the southerly boundary thereof, fronting on Montgomery Street, a veterans' memorial building, and further improved the property just north of the levee of the city of Oroville for picnic and recreational purposes by constructing chairs, tables, etc., in and about the south bank of the Feather River, and a swimming pool in the river itself. No question respecting the county's title to any portion of said Outside Lot 17 arose until the year 1940, when the Golden Feather Dredging Com-

pany, acting under plaintiff, started dredging operations for gold on the river adjoining the county's recreational grounds. The county notified the company that it was trespassing, and thereupon arrangements were made to impound the gold dredged from the property, awaiting the outcome of this suit, which was filed by plaintiff on December 7, 1940. The question involved was whether the deeds under which the county acquired the property carried title to the thread of the river or only to the south bank thereof.

In 1872 a map of the town of Oroville was made by one Edmund, which map is known as the Edmund's Survey of 1872. This map fixed the northerly boundary of said Outside Lot 17 at approximately the south bank of the Feather River. A subsequent map of the city of Oroville was made in 1900 by one Jasper, which map is known as the Jasper Survey of 1900. This map platted the north boundary of said lot to the thread of the Feather River, some 608 feet north of the line fixed by the Edmund's Survey. Plaintiff in 1919 received a deed to "All of outside Lot 17 of the City of Oroville, excepting the easterly 54 feet and 8 inches thereof." Plaintiff's deed to the title company described the property in the following manner: "All that certain real property situated partly in the City of Oroville and partly outside of said City, County of Butte, State of California, described as follows: All of Outside Lot Seventeen (17) of the Town, (now City) of Oroville, according to the Official Map thereof, filed in the office of the County Recorder of the County of Butte, State of California, *January 22nd, 1872,* saving and excepting . . ." (here follows exceptions, not here involved.) (Italics added.) The deed from the title company to the county of Butte used the same description; and the Supervisors of Butte County in the resolution accepting said deed also used the quoted description.

Plaintiff claims that he intended to convey, and did by the deed convey no more than to the south bank of the river, according to the line fixed by the Edmund's Survey; that as words of limitation in the description in the deed, Lot 17 was first restricted to the town of Oroville, as distinguished from the city of Oroville, and secondly, Lot 17 was defined as according to the official map filed in the office of the county recorder January 22, 1872. The evidence showed that since 1911 plaintiff had been acquiring the river bed for a mile and a half down stream from the Oroville

bridge for the purpose of conducting mining operations in the Feather River, and that he owned the north bank of the river opposite Lot 17. Plaintiff argues that this evidence lends further support to his contention that his intention was proved to be to convey only the land to the south bank of the river, not the river bed. This contention is without merit.

The river at the point here involved is non-navigable. Plaintiff makes the contention that the evidence showed that it was navigable; but it seems to be conceded that the disputed area is beyond the point defined as navigable in section 102 of the Harbors and Navigation Code, which defines the Feather River as navigable between its mouth and a point fifty feet below the first bridge crossing Feather River above the mouth of the Yuba River, and therefore the rules applicable to non-navigable streams are applicable here. They may be stated generally as follows: ''A grant or conveyance of land bounded by a non-navigable stream carries with it the bed of the stream to its center, unless a contrary intent is manifest from the grant or conveyance itself. In such case the stream is regarded as the boundary or monument, and the purchaser takes to the middle of the monument as part and parcel of the grant. . . .Where the possession of land described in a conveyance would raise a presumption of ownership of the land in front of it to the middle of a stream, it is the exclusion of the presumption and not its inclusion which must be evidenced by the terms of the grant, where the grantor had power to include the land to the middle of the stream. The general rule has been held to apply 'although the grant may call for marked corners upon the bank of the stream, and for a line or lines between such corners, which do not correspond with the center of the stream.' . . . And while an intent to exclude the bed of the stream will not be presumed, but must be clear from the terms of the deed as interpreted by the surrounding circumstances, yet the question whether the conveyance carries title to the center of the stream depends on the intent of the parties, to be gathered from the description of the premises read in connection with other parts of the deed and by reference to the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity. In other words, the presumption that the grantee takes to the center of the stream

may be controlled by the terms of the conveyance, as interpreted by surrounding circumstances, manifesting an intention to the contrary.'' (9 C.J. pp. 187-189, secs. 65, 66.) And section 830 of the Civil Code provides: ''Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary high water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; *when it borders upon any other water, the owner takes to the middle of the lake or stream.''* And section 2077 of the Code of Civil Procedure provides: ''The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it: . . . 4. When a road, or stream of water not navigable, is the boundary, *the rights of the grantor to the middle of the road or the thread of the stream are included in the conveyance,* except where the road or thread of the stream is held under another title.'' (Italics added.)

Here the intent of the grantor as appearing from the instrument of conveyance must be held to be by operation of law an intent to convey to the thread of the stream. The instrument of conveyance deeded the property according to the official map of January 22, 1872, which was the Edmund's Survey; and ''When maps, plats, or field notes are referred to in a grant or conveyance they are to be regarded as incorporated into the instrument and are usually held to furnish the true description of the boundaries of the land.'' (9 C.J. p. 180, sec. 50; *Anderson* v. *Trotter,* 213 Cal. 414 [2 P.2d 373].)　Plaintiff concedes that the line fixed by the Edmund's Survey in the map of 1872 was a *meander* line; and as held in *Anderson* v. *Trotter, supra* (citing 9 C.J. p. 181, sec. 51), a meander line cannot be considered a boundary (with certain exceptions not applicable here), but the true boundary is the stream or other body of water on which the land borders. In that case the plaintiffs acquired their titles through patents. The lands were conveyed according to the plat of a survey thereof made by one Tucker in 1875, which describes the lands as extending to and abutting upon the waters of Clear Lake. The Tucker survey ran a meander line, described on the plat as the meander line of Clear Lake, and the plat filed with the United States surveyor-general

and in the office of the interior department, shows the water-line of Clear Lake coincident with the meander line of the survey made by Tucker in 1875. Some 50 years later, in 1925, another survey was made by one Thorne, which placed the meander line beyond the line of the Tucker survey and included some 83 acres of land not shown to exist in the Tucker survey. Following the Thorne survey a patent was issued to defendant, including the 83 acres. Plaintiffs brought an action to quiet title, claiming title to the 83 acres. The trial court found against the claim of the defendant, holding that there was no basis for setting aside the Tucker survey, or holding that it was the result of either mistake or fraudulent act, and that under the law the water-line, and not the meander line, constituted the true boundary of the patented lands, and that the subsequent patent based upon a survey made fifty years later conveyed no title. The appellate court affirmed the judgment, and a writ of certiorari was denied by the United States Supreme Court. The appellate court, quoting from 9 C.J. p. 189, sec. 69, said: "The general rule adopted by both state and federal courts is that meander lines are not run as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey. The stream, or other body of water, and not the meander line as actually run on the ground, is the boundary, the purpose of meander lines being merely for the benefit of the government in ascertaining the quantity of land in the survey for which it requires payment; and the rules adopted in the various states as to the extent of the title of the owner of land bounded on rivers and other bodies of water apply in the case of land bounded on meandered waters."

Therefore the deed in the present case, by operation of law, conveyed title, not to the meander line which cannot be considered a boundary, but to the thread of the stream. See, also, *Hendricks* v. *Feather River Canal Co.*, 138 Cal. 423 [71 P. 496], and *Kirby* v. *Potter*, 138 Cal. 686 [72 P. 338], both involving lands along the Feather River, wherein it was held that the boundary of the lots involved there was not the meander line established by the government survey lines, along the bank of the river, but that the true boundary of the lots was the thread of the stream. Plaintiff makes the bare statement in his reply brief that "There is a difference

between the construction to be given boundary lines of acreage under government surveys, and the construction to be given to private surveys of a city lot, where no government surveys whatsoever are involved as, for example, the instant case.'' But no authority has been cited in support of the statement, and we can see no reason in view of the language quoted from *Anderson* v. *Trotter, supra,* why those rules should be limited to government surveys. (See analysis of *Anderson* v. *Trotter, supra,* in *McLeod* v. *Reyes,* 4 Cal.App. 2d 143 [40 P.2d 839].)

■ Moreover, and aside from the wording of the conveyance, there is ample evidence to support a finding that plaintiff's intent was to convey to the thread of the stream. Plaintiff knew that the county purchased the property as a site for a veterans' memorial building and public park and picnic ground. The river at this point contained a deep pond which had been used as a swimming hole for many years. Since plaintiff knew that the land was to be used as a public park, he must also have known that use of the large swimming hole upon which the land fronted would inevitably be a prime feature of the park. In fact he states in his reply brief: ''It was the intention of the plaintiff, and the same intention of the defendant, that the county should have all the rights of *boating, swimming* and picnicking along the bank of the Feather River.'' (Italics added.) In the situation disclosed here, plaintiff must have known that the county wanted and expected to obtain plaintiff's rights in the stream as well as in the land south of the south bank; and he does not claim that he did anything to dispel the public expectation. Nor did he make any claim to the land nor any objection to the county's use of the land or water, until his dredger began operating there. Under all these circumstances, it would seem that a finding that he intended to convey that portion of the property to the county would not be unwarranted, and that the trial court's judgment that defendant owns to the thread of the river is correct.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied March 1, 1944, and appellant's petition for a hearing by the Supreme Court was denied March 30, 1944. Carter, J., and Schauer, J., voted for a hearing.