[Civ. No. 20834.   First Dist., Div. One.   Mar. 10, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. WARD RED-
WOOD COMPANY, Defendant and Appellant.

Hardin, Fletcher, Cook & Hayes and Cyril Viadro for Defendant and Appellant.

Stanley Mosk, Attorney General, Ralph W. Scott, Leonard M. Sperry, Jr., and John F. Kraetzer, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, P. J.—Defendant corporation appeals from judgment quieting plaintiff's title to a certain parcel of land in the Klamath River, denominated Taylor Island.[1]

### SOLE QUESTION PRESENTED

Was there any substantial evidence that so-called Taylor Island is an island or an accumulation of land "formed in

---

[1]The area in dispute is referred to, as an "island" for ease in description.

the bed'' of the Klamath River within the meaning of section 1016, Civil Code, which provides: ''Islands and accumulations of land, formed in the beds of streams which are navigable, belong to the state, if there is no title or prescription to the contrary''?

RECORD

This action was brought by the State of California to quiet title to the above mentioned parcel of land. At the close of plaintiff's case, defendant, after withdrawing its motion for nonsuit, rested without submitting any evidence, relying on the well-known rule of law that in an action to quiet title the plaintiff must recover on the strength of his own title and not on the weakness of defendant's title. (See *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 706 [336 P.2d 524]; *Williams* v. *Barnett* (1955) 135 Cal.App.2d 607, 612-613 [287 P.2d 789]; 41 Cal.Jur.2d, Quieting Title, pp. 556-559.)

The court found that on the date the State of California was admitted to the Union, September 9, 1850, the Klamath River at and above the land in question was a navigable river. (This finding is not disputed.) It further found that the nucleus of the said land was formed in tide and submerged lands in the bed of the river as a sand bar below the line of mean high tide, which nucleus grew into an island in or about the year 1890. Accretions to the island gradually formed the present connections with the south bank. None of the land involved was formed from accretions to either the north or south banks. Plaintiff acquired title to the land upon its admission to the Union, and plaintiff is still the owner thereof. The court thereupon entered judgment quieting plaintiff's title to said land.

The Klamath River in the disputed area flows in an easterly-westerly direction. The island originated by an accumulation of submerged alluvial detritus near the north side of the river and moved, in effect, by subsequent erosion and deposition to the south side of the river. The island is a short distance upstream from the mouth of the Klamath and is subject to the ebb and flow of tides. Defendant's property abuts the south bank of the river and runs to ordinary or mean high water mark.

At the present time, the island is not entirely surrounded by the waters of the river, and is not *now* an island. Its land is now attached in part to the south bank of the river (defendant's land). Admittedly, however, the fact that it is now

attached to that bank would not affect plaintiff's title *if* it originally was formed as an island or an accumulation of land in the bed of the river. Thus, whether it formed such an island or an accumulation of land is the question at issue.

The land in question started out as a sand or gravel bar in the bed of the river. The river had progressively cut into its south bank, creating this sand bar. Later, as the result of flood action, the river straightened itself and cut a new channel through part of the north bank, apparently separating Taylor Island bed from its connection to the north bank and making it a true island. It then became known as Taylor Island.

Plaintiff contends that, as will hereinafter appear, its evidence shows (1) that in 1886 the land was a sand bar lying below either high or low water mark of the Klamath, and that a reasonable inference could be drawn therefrom that it was in such condition in 1850 when California was admitted to the Union. This would make it land below the water of a navigable stream, as mentioned in section 670, Civil Code, which states: "The state is the owner of all land below tidewater, and below ordinary high-water mark, bordering upon tide-water within the state; *of all land below the water of a navigable lake or stream. ...*" (Italics added.) (2) That the land was an island or accumulation of land formed in the bed of a navigable stream, and therefore section 1016, *supra*, applies, regardless of when the land was formed.

Plaintiff further contends that its evidence shows that in 1886 the land was still a sand bar under water which by 1890 due to flooding and a change in the channel of the river, had become an island in the bed of the river, thus making applicable section 1016, Civil Code. Defendant contends that even if the land was an underwater sand bar in 1886 and an island in the bed of the river as early as 1908, plaintiff has failed to negative the possibility that between those dates the land might have been attached to the north bank of the river by accretion. It is conceded that had the land before becoming an island attached itself by accretion to the north bank, the title would then have passed to the owner of that bank. (The upland owner owns to the line of mean high tide. See 52 Cal.Jur.2d, Waters, § 794, pp. 439-441.) If the land became thereafter severed, it could not become the property of the state.

"Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by recession

of the stream, such land belongs to the owner of the bank. ...'' (Civ. Code, § 1014; see *Carpenter* v. *City of Santa Monica* (1944) 63 Cal.App.2d 772, 788 [147 P.2d 964]; *City of Los Angeles* v. *Anderson* (1929) 206 Cal. 662, 666-667 [275 P. 789].)

█ Under the rules applicable to avulsion (the sudden and perceptible loss or addition to land by the action of water or otherwise) if the land, after attachment above water to the north bank, became suddenly cut off therefrom the title thereto would still remain in the owner of the north bank. (See *Butts* v. *Cummings* (1953) 117 Cal.App.2d 432, 434 [256 P.2d 52]; 51 Cal.Jur. 2d, Waters, § 20, pp. 474-475.)

## THE EVIDENCE

It starts with the so-called Gilcrest Survey of 1886, which appears on the Surveyor-General's Map filed with the Register on October 21, 1889. This map shows the land in question to be a ''Low Sand Bar'' adjacent to the north bank of the river. It is shown as an area covered with dots (indicating that the nature of that land is different than that of the neighboring shoreline) and is founded on the north side by a heavy white line interspersed with dots representing survey stations. This line corresponds with the courses and distances set forth in a table on the map. The Klamath River is shown as surrounding it on the other three sides. The parties concede that the line is a meander line. █ A meander line is not necessarily a boundary line but is for the ''purpose of defining the sinuosities of the banks of the stream ... and as a means of ascertaining the quantity of land embraced in the survey.'' (*McLeod* v. *Reyes* (1935) 4 Cal.App.2d 143, 154 [40 P.2d 839].)

However, plaintiff contends that the line in question is a meander line showing also either the low water or high water line of the river, and that as the title of the owner of the land on the north bank runs only to the high water mark, and as the land in question is indicated as being under that line, it is not material which water line it may be. Defendant contends that as a meander line may not always be the same line as either the low or high water mark it is possible that there was north of the meander line land to which the sand bar was attached and which might have broken off to form the island. Therefore, contends defendant, it was the burden of plaintiff to show that this did not occur.

The evidence that the meander line was also the low water line follows:

In 1881 instructions of the Commissioner of the General Land Office were issued to the United States Surveyors General relating to the survey of swamp or overflowed lands. These instructions were in pertinent part: "Meander lines should not be established at the segregation line between dry and swamp or overflowed land, but at the ordinary low-water mark of the actual margin of the rivers or lakes on which such swamp or overflowed lands border." If these instructions apply to the Gilcrest Map, then the dotted line would be both the meander line and the low water mark. Inasmuch as there appear to have been no instructions issued to the United States Surveyors General concerning the survey of the banks of navigable rivers affected by the tidal flow, as is the situation here, it would be a reasonable inference that the surveyors would use the swamp or overflowed lands method in surveying river land affected by tidal ebb and flow. Moreover, on this map, other areas which are entirely surrounded by water are completely encircled with a similar white line interspersed with dots, while land bordering on but not surrounded by water, show such line only on the water side, which is the situation at the sand bar.

There is testimony to the effect that the meander line was the high water mark. A "Manual of Surveying Instructions" issued in 1894 provided that the meander line on all waters, navigable or not navigable, should be meandered at the ordinary mean high water mark. Assuming the meander line on the Gilcrest Map to be the high water mark rather than the low water mark, does not affect the situation here. The landowner owned only to the high water mark and any sand bar such as the one in question on the water side of either that mark or the low water mark would belong to the state. To defeat the state's title, it would have to be shown that the underwater sand bar was attached above the high water mark to the bank, and thereafter became severed from the bank.

In California, ordinary high water mark is normal high water. (See *Ross* v. *Burkhard Investment Co.* (1928) 90 Cal.App. 201, 207 [265 P. 982].) It is the "average level of the water attained by such a river in its annual seasonal flow. ..." (*Mammoth Gold Dredging Co.* v. *Forbes* (1940) 39 Cal.App.2d 739, 752 [104 P.2d 131].)

The field notes of the Gilcrest Survey show that a stake for a quarter section corner was planted in about the center of the bar, and that the line proceeded from that bar to the north bank without crossing a channel. If the sand

bar was then above the water and not attached above water to the bank, the title thereto would be in the state as "accumulations of land," formed in the bed of a navigable stream. (See *Bouchard* v. *Abrahamsen* (1911) 160 Cal. 792, 797 [118 P. 233].)

The notes of the surveyor represent his *observations* at the time he ran the survey line. Thus, whether the island was out of water at that time, so as to permit driving a stake into the sand, does not conclude the question whether the meander line is drawn at high or low water. It merely indicates that on June 18, 1886, when he was making the survey, the sand bar was out of water. It is possible that he was surveying at the time of low water but laid the line at the place along the shore that he thought the line of ordinary high water ran. It is, therefore, perfectly consistent that his *acts* indicated that the sand bar was out of water, but that the line drawn indicates that at normal periods of high water the sand bar would be under water. Since the survey was in June, the surveyor could reasonably anticipate that no high water would wash away the stake until any use which might be made of it was completed. Moreover, the surveyor had no control over where the quarter section fell. Clearly, if the quarter section fell into deep water, no stake would be used. But it does not therefore follow that use of a sand bar might not be made if available.

If the meander line in question is the line of ordinary high water, it follows that the low sand bar indicated must be beneath that line, whether it was beneath the *water* on that day or not. Otherwise, the line of ordinary high water would have extended around at least part of that sand bar since that area would be above the ordinary high water mark. Any land which accreted above the line of ordinary high water, therefore, would lie north of the meander line and would be represented, presumably, by solid color rather than dots. ▮ It therefore follows that the land in question, though shown as affixed to the north bank, belonged to the state when it was admitted to the Union in 1850 by virtue of section 670, Civil Code, and continued so to belong up to the time the survey was made. It would continue to so belong unless and until that land accreted to the north bank above the ordinary high water mark. Thus, having shown that the land as of 1886 was below the ordinary high water mark of the river, the state has made a sufficient showing of its title to shift the burden on the defendant to show that some time thereafter and be-

fore the island was cut loose by the river's flooding the sand bar or part of it accreted above that high water mark so as to accrue to the upland owner.

If the meander line in question is taken to be the ordinary low water mark, then it must follow that the land in question is below the ordinary *high* water mark and therefore clearly as of 1886 was state property. This is more difficult to square with the surveyor's observations, since it would seem to follow that the low sand bar should be under water at this time of year and it is not particularly reasonable that a surveyor would drive an 18-inch stake into the sand below water. Even so, however, between 1886 and the mid 1890's when the flooding of the river was alleged to have taken place, it is doubtful that any of the land could have accreted so far as to adhere above the line of ordinary high water and hence attach to the north bank. Having shown that the map of 1886 indicates the land to be below *either* the low or high water mark and in either case belonging to the state at that time, the burden shifted to defendant to show that in the 30 years preceding the period when eyewitness testimony indicates the island was fully an island, some of that land accreted to the north bank above the line of ordinary high water.

The evidence here shows that the sand bank appearing on the Gilcrest Map began gradually to rise in the bed of the river and by the change of the river channel about 1890, became an island. It appears as an island on the Gold Dredging Land Map of 1908, there being water on both sides of it. This map shows that the channel of the river had shifted northward. The island is no longer depicted by dots but by the same flat color as other nonsubmerged land on the map.

The field notes of one Joy, a United States engineer, who retraced a portion of the land in question, indicates that in 1925 the parcel was an "old gravel bar now termed an island and at times overflowed."

Plaintiff introduced Dr. MacGinite of Humboldt State College, an expert in engineering, physics, geology and paleontology. He testified that the natural course of streams is to straighten out in the direction of flow during flood periods. He further testified that sinuosity of a river in its development increases in the normal course of events, eroding the bank on the outside of the bends and depositing silt and alluvion on the inside of those bends. As the new channel formed by the flooding condition is cut by high water washing across the shortest distance and cutting off the

area made of prior deposits of alluvion, the old channel may continue for some time or may be gradually filled in and cease to be a channel at all. It was his opinion that a similar course of development took place with respect to the evolution of Taylor Island. He further testified, from his own tests, that about 80 per cent of the material comprising the island originated upstream and washed down and was deposited to form the island. This conclusion was corroborated by another witness, McCreary, a geologist and civil engineer who had made his own independent tests. It was his opinion that the land forming the island was not an outgrowth of the south shore.

Natives of the area testified that Taylor Island existed as an island above the level of the river for many years. One testified that in 1915 water flowed around both sides of the island. Another witness, 74, who had lived in the area all his life, said that the island existed as an island when he was a small boy. He further testified that after about 1890 the northern channel was getting deeper. Another witness testified to its existence as an island at about the same time.

The McCreary report sets forth the results of extensive geological exploration in the area. That report concludes: ''From a study of old topographic maps, photos and other historical data of the area, it is indicated that the origin of Taylor Island was a point bar deposit of heavy gravels. It is quite possible that the original point bar deposit was a tip of the north shore line and was left as a remnant in mid-river after a flood resulted in a channel change to the north of this island section. Subsequent heavy gravel deposits increased the size of Taylor Island to a point where the major river flow was diverted to the north and constricted the flow on the south side to an extent where in the early 1900's historical records indicate a relatively narrow, slow current channel separated the island from the south shore.''

Dr. MacGinite at one point gave ambiguous testimony. What he said could mean either that the land cut off was above the water before the flood, or that it arose out of the water as a result of the flood. Apparently the trial court accepted the latter interpretation. Moreover, he did not testify that in his opinion the island had ever been attached to the north bank above water.

Defendant contends that plaintiff has failed to prove that Taylor Island was not formed from alluvion (gradual attachment to the north bank), and thereafter detached from that bank. Section 1014, Civil Code, provides: ''Where, from

natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank.'' Section 1018 provides: ''If a stream, navigable or not navigable, in forming itself a new arm, divides itself and surrounds land belonging to the owner of the shore, and thereby forms an island, the island belongs to such owner.''

Defendant moreover contends that the evidence affirmatively indicated that the land mass was formed by accretion to the north bank of the river. This contention is based solely upon Dr. MacGinite's testimony that there had been accretion to the sand bar. There was no testimony that there had been accretion to the north bank.

The nearest case in point of facts to our case is *Heckman* v. *Swett* (1893) 99 Cal. 303 [33 P. 1099]. There the plaintiffs owned swampland on the north bank of the Eel River, both navigable and tidal, patented to them through their grantor by the state in 1882. The defendants, at the time of the suit, owned swampland on the south bank of the river. At the time of the swampland survey the lots in question were wholly on the south side of the river and were described in the survey and in the patents as bounded by the river. During the winter of 1861-1862 there occurred a sudden and unusually excessive rise in the river waters. During the course of this freshet much of the land on the south bank of the river was submerged and some of it washed away. When the water finally subsided, it was found that the river had cut a new channel south of its original channel. The result of the cutting of this new channel was that an island, composed of the defendants' land, was created between the old channel and the new one. The plaintiffs brought a quiet title action to declare that the island so formed did not belong to the defendants. The appellate court construed the findings of the lower court to mean that the land forming the island belonged to the defendants only by virtue of its appearing within the lines of his property set out by the survey. The land forming the island was held to be only a deposit formed by the river and left between the channels. The court held that so construed the island formed belonged to the state. Since the island was not mentioned in the patents and since title to the south shoreline did not vest in the defendants until after the island had been severed from the mainland, the defendant's title was held to run only to the south bank.

The rule to be derived from the cases seems to be as follows:    ▮    If an island or accumulation of land[2] *originates* in the bed of a navigable river, the fact that after the land mass emerges from beneath the water it subsequently adheres to either bank of the river through accretion or reliction does not change or destroy the state's title thereto. (See generally 54 A.L.R.2d 643, for a good comprehensive discussion.) ▮ If, however, the land in question first emerged from beneath the water as alluvion deposited as accretion upon the upland bordering the river, title accrued to the upland owner.

▮    The evidence supports a finding that in 1886 the "low sand bar" was not attached above water to the north bank. A reasonable inference based upon Dr. MacGinite's testimony as to the normal evolution of a sand bank in a river, is that in 1850 the low sand bank was lower than in 1886 and was not attached above water to the north bank.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1964.

---

[2]Accumulation of land was probably used to encompass flats or shoals subject to inundation during high tides or high waters which might otherwise not be included. (Cf. *Fowler* v. *Wood* (1906) 73 Kan. 511 [85 P. 763, 117 Am.St.Rep. 534, 6 L.R.A. N.S. 162]; *Payne* v. *Hall* (1921) 192 Iowa 780 [185 N.W. 912]; *McBride* v. *Steinweden* (1906) 72 Kan. 508 [83 P. 822].)