[No. F058617. Fifth Dist. May 2, 2012.]

SUMNER HILL HOMEOWNERS' ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
RIO MESA HOLDINGS, LLC, et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV. and VI.

**1002**

[redacted]

**COUNSEL**

Dowling, Aaron & Keeler, Lynne Thaxter Brown; Law Offices of Walter W. Whelan, Walter W. Whelan and Brian D. Whelan for Plaintiffs and Appellants Sumner Hill Homeowners' Association, Inc., Michael Seng, Jim Hutton, Lelon Forlines, Rosa Forlines, Susan Early and John McGuckin.

Robert J. Rosati for Plaintiff and Appellant David Kaye.

McKenna, Long & Aldridge, Charles A. Bird, Gerald M. Murphy, Antony D. Nash and Joshua M. Heinlein for Defendants and Appellants.

Smiland & Chester, William M. Smiland, Theodore Chester; McCormick, Barstow, Sheppard, Wayte & Carruth and Marshall C. Whitney for Sumner Peck Ranch, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Douglas W. Nelson, County Counsel, for County of Madera as Amicus Curiae on behalf of Defendants and Appellants.

## OPINION

**KANE, J.**—For over two decades, homeowners at Sumner Hill, an isolated subdivision on bluffs overlooking the San Joaquin River, experienced the privacy of living in a remote, rural location within the confines of a security gate. They also enjoyed unrestricted access to the San Joaquin River on a dirt road within the subdivision known as Killkelly Road. Because Killkelly Road was inside the gated residential area, river access by that route was available to Sumner Hill homeowners but not the general public. The homeowners believed these amenities—a private, gated community and unrestricted river access—were part of what they purchased when they bought their lots in the subdivision. Eventually, however, the trajectory of future development reached that area and the homeowners' status quo was challenged. A developer, Rio Mesa Holdings, LLC, purchased the surrounding land and announced plans for a large-scale suburban development that would include public access to the San Joaquin River *directly through* the Sumner Hill subdivision using Killkelly Road. The same party also installed a gate restricting the homeowners' access to Killkelly Road. These events precipitated the present litigation. A complaint was filed by several individual homeowners[1] and the Sumner Hill Homeowners' Association, Inc. (collectively plaintiffs), against Rio Mesa Holdings, LLC, and Tesoro Viejo, Inc. (collectively defendants). Plaintiffs sought a judicial determination of their alleged right to maintain Sumner Hill as a private, gated subdivision and to have unrestricted use of Killkelly Road for access to the San Joaquin River. Plaintiffs also sought damages for alleged slander of title and related tort causes of action. Defendants cross-complained, claiming that the public had a right of access to the river from Killkelly Road and consequently the subdivision map would have to be reformed or amended to specifically provide for such access.

The various issues raised by the pleadings included: Did plaintiffs have a right to maintain a private, gated subdivision from which the public could be excluded? Who owned Killkelly Road and other roads in the subdivision? Did plaintiffs possess easement rights to use Killkelly Road for access to the river? Should a public access route to the river through the subdivision have

---

[1] Although not all of the persons owning homes or lots in the subdivision are plaintiffs herein, for convenience we generally use the terms "homeowners" or "lot owners" as synonymous with the individual plaintiffs herein. The individual plaintiffs were David Kaye, Michael Seng, Jim Hutton, Lelon Forlines, Rosa Forlines, Susan Early, John McGuckin, Irwin Barg and Nancy Barg. With respect to the issues addressed herein, these individual plaintiffs' property rights were aligned with the other (nonparty) homeowners or lot owners.

been expressly provided for on the final subdivision map approved by the county, pursuant to Government Code section 66478.1 et seq.?[2]

The trial court resolved the main issues in plaintiffs' favor by determining the private (nonpublic) character of the gated residential area, confirming plaintiffs' easement rights to use Killkelly Road and denying defendants' claim of public access to the river. Thereafter, a jury heard the tort causes of action and awarded damages to plaintiffs for slander of title and nuisance, including punitive damages. Defendants filed this appeal from the judgment and plaintiffs cross-appealed as to certain issues. Between them, the parties challenge almost every outcome below. We conclude that with a few significant exceptions (e.g., road ownership and certain development restrictions imposed on defendants), the results obtained in the trial court were correct and/or did not constitute an abuse of discretion. In short, our disposition will be to affirm the judgment in part and to overrule it in part.

At the outset, we briefly highlight two publishable issues. The first such issue is whether, for purposes of the right of public access, the section of the San Joaquin River under consideration is a public (i.e., navigable) waterway. Although we stop short of deciding that issue here, our discussion will shed light on a significant uncertainty that exists in the law of navigability in cases such as this. The second publishable issue before us relates to the cause of action for slander of title. The particular question is whether a slander of title cause of action may be maintained if the only pecuniary damages proven by plaintiffs are the attorney fees incurred to clear the slandered title. We conclude that such damages are sufficient, without the need to prove other pecuniary harm, at least where (as here) the slander of title was by means of a recorded instrument.

## FACTS AND PROCEDURAL HISTORY

*Creation of the Sumner Hill Subdivision*

Carolyn Peck (Peck) and her late husband, Sumner Peck, owned a considerable swath of agricultural land in Madera County (the County) between Highway 41 and the San Joaquin River off of Road 204. The property was known as Peck Ranch.[3] During the events relevant to this appeal, Peck Ranch was owned and operated by a family owned company known as Sumner-Peck

---

[2] Unless otherwise specified, all further statutory references are to the Government Code. These sections are contained within the part of the Government Code known as the Subdivision Map Act (see § 66410 et seq.).

[3] The parties offered differing estimates of the size of Peck Ranch, ranging from 1,500 to 1,860 acres. We provide these estimates as background; the precise acreage is not material to our decision.

Ranch, Inc. (Sumner-Peck).[4] In the 1980's, Peck wanted to subdivide a portion of Peck Ranch to create a tract of custom residential lots on hills above the surrounding farmland and near the river. A specific development proposal was made by Sumner-Peck to the County.

The County had concerns with the proposal for a residential development in that location.[5] First, it was recognized that there could be an adverse impact on nearby cattle-grazing operations, with a particular issue of pet dogs harassing cattle. Second, the site was remote from law enforcement support and the County was concerned about the cost of responding to that site when its law enforcement resources were already stretched thin.

In 1983, the County approved the proposed subdivision, known as Sumner Hill. As a condition for approval, the County required Sumner-Peck to install a security gate and a perimeter fence around the subdivision, which measures were imposed to keep homeowners' dogs away from nearby cattle and to minimize the need for law enforcement to travel to the subdivision's remote location. Madera County Service Area No. 16 was established for the purpose of providing necessary services to the proposed subdivision. A final subdivision map for Sumner Hill was recorded in 1984. An amended final subdivision map (the Amended Map) was approved and recorded in 1985.

The Amended Map for Sumner Hill created a tract of 49 custom residential lots on approximately 160 acres (the 49-Lot area) surrounded by several "Outlots" of varying sizes (lettered as Outlots A through J), a road system, and other appurtenant facilities providing the infrastructure of the subdivision. The 49-Lot area was bordered on the west by Outlots A and B, which comprise approximately 500 acres of agricultural or open land.[6] On its eastern side, the 49-Lot area is separated from the San Joaquin River by Outlots C and D, which comprise approximately 50 acres of steeply sloped land accessible from Killkelly Road. The Amended Map reflected that all the roads within the Sumner Hill subdivision were dedicated as public roads.[7] Killarney Drive was the main road in the subdivision and provided access to the 49-Lot area from Road 204. Several small cul-de-sacs branched off of Killarney Drive. Killkelly Road, which also branched off of Killarney Drive, traversed down a steep hill to the San Joaquin River. The Amended Map showed Killkelly Road in solid lines as it crossed over Outlot C, then in

---

[4] A related entity owned by the Peck family, Sumner-Peck Ranch Development, Inc., was also involved in the development of the land. These two entities eventually merged. For convenience, we refer to both as Sumner-Peck.

[5] An earlier version of the proposed subdivision was called Domain St. Jean-Marie.

[6] The acreage estimates are taken from an estimate in defendants' opening brief.

[7] But in the 1990's, the County vacated the roads. More on that will be said in our discussion of who owns the roads.

broken lines as it continued to the river over Outlot D, where a 60-foot easement for ingress and egress was indicated.

As developed, Killarney Drive and the cul-de-sacs were paved, while Killkelly Road remained a dirt road. Before sales of the individual lots commenced, a security gate was installed at the front entrance to the subdivision at Killarney Drive, and a fence was installed around the perimeter of the 49-Lot area. The security gate required a pass code to enter.

*Marketing of the Residential Lots at Sumner Hill*

In 1984, the Department of Real Estate issued a final subdivision public report (referred to as "the white paper"). Among other information, the white paper notified potential purchasers of the uses of the Outlots at that time. For example, it stated that Outlots A through D were agricultural and/or open space, while Outlots F through J were agricultural but also contained facilities used by Sumner Hill lot owners, such as water wells, tanks and wastewater treatment. According to the white paper, the Outlots were not for sale and Sumner-Peck would continue to own fee title to them. It explained that although "Certain of the Outlots . . . will contain some facilities (for example water wells and the leachfield) which will be operated and maintained by the Madera County Service Area Number 16," fee title to the Outlots remained in Sumner-Peck. Indeed, the white paper observed that, at that time, "Vast amounts of the Outlots . . . consist of recently planted vineyards which are part of the Sumner Peck Ranch Operation." (Some capitalization omitted.)

Peck engaged real estate agent Don Becker of Pearson Realty to market and sell the 49 residential lots. A marketing brochure was prepared under Peck's supervision. With Peck's approval, Becker gave the brochure to prospective purchasers. The brochure stated that residents of Sumner Hill will "[e]nter through the electronic security gate" and enjoy "protected privacy." It also stated that they will "enjoy open common areas and river access," and a map was attached showing river access from Killkelly Road. Peck authorized Becker to tell prospective purchasers that all lot owners at Sumner Hill would have a right of access to the river, and Becker did so. He believed that river access was a unique selling point for the subdivision.

David Swain was one of the first to purchase a lot at Sumner Hill in late 1985 or early 1986. Becker gave him the marketing brochure and also told Swain that "if [he] bought a lot out there, [he] had access to the river. That was part of the deal." When Swain bought his lot, the security gate and perimeter fence were in place. Becker told him they were for the "safety and security of the development."

The sale of lots in the mid-1980's proceeded slowly. In September 1986, after only six lots had been sold, Wells Fargo Bank, the project lender, took

over the remainder of the 49 lots upon receipt of a deed in lieu of foreclosure.[8] Thereafter, Wells Fargo Bank hired Becker to continue marketing and selling the lots. Richard Muma of Wells Fargo Bank authorized Becker to continue to use the marketing brochure and to tell prospective purchasers that river access was one of the amenities of the subdivision. Peck had informed Muma that the lot owners were allowed to use Killkelly Road for access to the river, as promised in the brochure. Becker continued to market the lots for Wells Fargo Bank with "[e]xactly" the same approach and materials as he had used for Peck.

Eric Fogderude purchased a lot at Sumner Hill in 1987. Becker gave Fogderude the marketing brochure, a copy of the Amended Map, the white paper and a newspaper article about the subdivision. Becker told Fogderude that the subdivision was a private, gated community, fenced for security purposes, and that river access was included. These were "primary considerations" for Fogderude in his decision to buy the lot.

Gary Christy also purchased a lot at Sumner Hill in 1987. He had received the marketing brochure and a copy of the white paper. The security gate was in place when he viewed the property, and he was told by Becker that Sumner Hill was a private, gated subdivision. Becker also told him that lot owners would have river access and the Outlots were not going to be developed. Another agent at Pearson Realty said essentially the same thing. Christy relied on these statements and the statements in the marketing brochure when he purchased his lot.

Michael Seng bought his lot at Sumner Hill sometime after Wells Fargo Bank took over. Before Seng bought his lot, he had discussions with Becker and received a copy of the marketing brochure. Becker promised Seng that lot owners would have access to the river from Killkelly Road, which was important to Seng. Seng understood that the statements in the marketing brochure regarding river access, an electronic security gate and protected privacy were promises that were "all part of the package." However, Seng was concerned that he bought his lot from one party (i.e., Wells Fargo Bank) but another party (Sumner-Peck) apparently owned or controlled the land on which Killkelly Road was situated. He therefore wanted something in writing as a further assurance of his right of river access. He entered into a license agreement with Sumner-Peck that expressly gave him a right of pedestrian and automobile passage along Killkelly Road to the river. The license agreement was signed by Peck and recorded in June 1987.

---

[8] Wells Fargo Bank received only the unsold lots in the 49-Lot area, not the Outlots.

The last Wells Fargo-owned lot at Sumner Hill was sold in late 1989. Others who presently own a lot/home in Sumner Hill subdivision, such as David Kaye and Susan Early, bought from intervening owners.

When each of the 49 residential lots in the Sumner Hill subdivision was sold, title to each lot was transferred by a deed that described the real property conveyed by reference to the Amended Map, which map specifically depicted the subdivision's roadway system, including Killkelly Road.

*The Security Gate and Fence*

Since the time that the residential lots were first marketed and sold, a security gate was in place at the entrance to the subdivision. The security gate required a pass code to open. Thus, the general public had always been excluded from the subdivision. When uninvited members of the general public found their way into the 49-Lot area, residents asked them to leave and occasionally called law enforcement. In addition, "PRIVATE PROPERTY—NO TRESPASSING" signs had been posted at the entrance and at other locations in one form or another since the inception of the subdivision. The perimeter fence had likewise been in place from the beginning.

Initially, there was apparently a question of who was responsible for maintaining the security gate and fence. Sumner-Peck attempted to transfer the gate and fence to the County, but the County rejected the offer. Wells Fargo Bank amended the CC&R's[9] in 1988 to provide that the Sumner Hill Homeowners' Association (the Association) would be responsible for maintaining the gate and fence. Since then, the security gate and fence have been maintained by the Association.

*The Roads*

A number of documents were presented in the trial court on the question of ownership of the roads[10] in the Sumner Hill subdivision. As noted, the Amended Map showed that "THE STREETS AND EASEMENTS" in the subdivision, including Killkelly Road, were dedicated "FOR PUBLIC USE." The words of dedication did not specify a transfer of fee title to the roads, which ordinarily would mean that only an easement for road purposes was

---

[9] As the parties have done, we use "CC&R's" as an abbreviation for "covenants, conditions and restrictions" recorded as mutually enforceable servitudes binding the parcels of a particular tract.

[10] We use the terms streets and roads interchangeably. (See, e.g., Sts. & Hy. Code, § 8308; Gov. Code, § 65002.)

transferred to the public agency.[11] The trial court followed that general rule in construing the words of dedication, concluding that Sumner-Peck retained fee title to the roads.

In 1986, Sumner-Peck entered into an agreement with the County for the purpose of securing a second source of water for the subdivision. The agreement provided that Sumner-Peck transferred all of its right, title and interest in the subdivision's water system, drainage, sewage system and "road system" (as defined in an attached exhibit) to the County. The attached exhibit described only specified road "[i]mprovements" such as roads, curbs and gutters of the subdivision's roads, but did not expressly include title to the land on which the roads were situated. The trial court concluded the 1986 agreement did not alter Sumner-Peck's fee title ownership of the subdivision roads, but only transferred improvements relating to said roads.

In 1993, the County vacated its interest in Killkelly Road, finding it unnecessary for any present or prospective public use. In 1995, the County vacated all (other) "roads of the Sumner Hill Subdivision," and then conveyed all of its interest in such roads to the Association. The 1995 conveyance was by grant deed, which stated that it included the "fee interest" in the real property (i.e., the roads) being conveyed. The County's 1995 resolution approving the vacation of the roads and subsequent conveyance of the County's interest in the roads included a requirement that the Association own, operate and maintain the subdivision roads as private roads for the benefit of the lot owners within the subdivision and that the County and County Service Area No. 16 would no longer have any responsibility for maintenance of the roads. Historically, even before 1995, the Association had undertaken some efforts to maintain the paved roads in the subdivision.

With respect to road usage, the homeowners at Sumner Hill regularly used Killarney Drive, the cul-de-sacs and Killkelly Road from the inception of the subdivision. Moreover, they enjoyed unrestricted use of Killkelly Road to reach the San Joaquin River, including both pedestrian and vehicular use. The Peck family never prevented the homeowners from accessing the river at any time nor complained about them doing so.

In late 2002, the Association paid for and installed a gate inside the subdivision at the top of Killkelly Road. A few of the homeowners did the actual installation. The installation of the gate was done with permission of a Peck family member, Maury Peck, who managed Peck Ranch. The entry code for the gate lock was known to the Peck family and to the Sumner Hill homeowners, and it was freely used by both groups to gain entry to Killkelly Road.

---

[11] Regarding that general rule, see *Safwenberg v. Marquez* (1975) 50 Cal.App.3d 301, 307 [123 Cal.Rptr. 405].

*Sale of Peck Ranch to Rio Mesa Holdings, LLC, and Major Development Proposed*

In 2003, contracts were signed in which Sumner-Peck agreed to sell the entire remainder of Peck Ranch, including the subdivision Outlots, to an entity that later assigned all of its rights to Rio Mesa Holdings, LLC. During the escrow, Rio Mesa Holdings, LLC, as buyer, had a specific period of time to complete its investigation of the property and Sumner-Peck, as seller, was required to cooperate in that investigation. In November 2004, escrow closed and the Peck Ranch property, including the Outlots, was conveyed to Rio Mesa Holdings, LLC.[12]

At the time of the sale of Peck Ranch to defendant,[13] Sumner-Peck did not disclose any information or documents relating to either the homeowners' use of Killkelly Road for access to the river or their expectation that Sumner Hill was a private, gated subdivision. Likewise, defendant never asked Peck or the Sumner Hill homeowners about such matters before purchasing the property. Robert McCaffrey, who was manager of Rio Mesa Holdings, LLC, explained that he did not think such questions were necessary. When Peck had given McCaffrey a tour of the property, it was apparent to McCaffrey that Peck (or Sumner-Peck) owned the gates and roads in the Sumner Hill subdivision since Peck had access to and could open all of the security gates (including at Killarney Drive and Killkelly Road) using a Peck Ranch standard entry code, even where "no trespassing" signs were posted. Also, Outlots A and B clearly abutted the subdivision roads at a number of locations, and the existence of these access points gave McCaffrey the impression that it was a phased development. As for Killkelly Road, it had a security gate opened by Peck and the steep dirt road appeared to be in such a condition that it would only be used by ranch and farm trucks to get to Outlot D below.[14] According to McCaffrey, he did not think the homeowners used Killkelly Road for vehicular access to the river. From these initial observations and impressions, McCaffrey assumed in purchasing Peck Ranch that there would be no hindrance to having access to all parts of Peck Ranch (including the Outlots) on the existing road system in the Sumner Hill subdivision. Moreover, he was sure the general public had a legal right of access to the river through the subdivision.

---

[12] The purchase contracts were signed in November 2003 by Robert McCaffrey as an officer of Ciao Properties, LLC, which entity was later replaced by Rio Mesa Holdings, LLC, pursuant to an assignment of rights. Under the purchase contracts, the buyer had 120 days to investigate facts pertinent to the property, and Sumner-Peck had a duty to provide documents requested by the buyer and to allow the buyer access to the property.

[13] When we refer to defendant in the singular, we mean Rio Mesa Holdings, LLC.

[14] There were Peck Ranch grapevines on Outlot D near the river, along with water pumps, pipes and other equipment.

As noted, escrow closed in November 2004. The following year, Rio Mesa Holdings, LLC, announced through McCaffrey its plans for a massive residential and commercial development that would be known as "Tesoro Viejo." A related McCaffrey-led entity, defendant Tesoro Viejo, Inc., allegedly was in the process of obtaining the entitlements for the development and had an option to purchase the property from Rio Mesa Holdings, LLC. The new development would be located on the Peck Ranch property, including on portions of Outlots A through D of the Sumner Hill subdivision.[15]

As proposed by defendants, the Tesoro Viejo development would include a public access route to the San Joaquin River *directly through* the Sumner Hill subdivision down Killkelly Road. McCaffrey was convinced that the public had a right to such river access and it became an important aspect of the Tesoro Viejo proposal.[16] Defendants hoped to offer river access to future purchasers of residential lots in Tesoro Viejo, which would enhance the marketability and value of those lots. As proposed, such river access would include pedestrian or bike trails crossing through the subdivision, as well as limited vehicular access. Defendants also proposed to build a winery and restaurant by the river on Outlot D, with vehicular access provided through Sumner Hill using Killkelly Road.

*McCaffrey and Defendants Interact with Sumner Hill Homeowners*

McCaffrey claimed that he first learned the Sumner Hill homeowners had vehicular access to the river on Killkelly Road when, in April 2005, he encountered a young man in a pickup truck at the bottom of Killkelly Road who told McCaffrey that he needed no help getting back out the gate because he was a Sumner Hill resident and all of the residents knew the access code. McCaffrey immediately contacted Peck's office manager, Ken Lazarus (who was also Peck's son-in-law). Lazarus responded to McCaffrey by letter dated May 9, 2005, stating that it was Sumner-Peck's intent "to give the Sumner Hill residents some kind of a right to go down the road to have access to the bank of the San Joaquin River," but Sumner-Peck never got around to formalizing that intent. The letter surprised McCaffrey.

In response, McCaffrey sought the advice of his legal counsel and, in May 2005, Rio Mesa Holdings, LLC, recorded a document entitled "NOTICE OF PERMISSION TO USE LAND" (Notice of Permission) in the County's recorder's

---

[15] The Tesoro Viejo development was proposed by defendants pursuant to the County's 1995 Rio Mesa Area Plan, which plan envisioned extensive growth and development in the Rio Mesa area of the County.

[16] McCaffrey viewed river access, combined with the connected network of trails and parks that would be created in the proposal, as something that would not only enhance the value of the lots in Tesoro Viejo, but would make the development his legacy.

office. The Notice of Permission stated that Rio Mesa Holdings, LLC, was the owner of all the Outlots of the Sumner Hill subdivision, including "those portions of Killkelly Road (vacated) lying within and adjoining said Outlots C and D, said road being vacated by resolution of the Board of Supervisors of the County[. A] certified copy of said resolution being recorded December 21, 1993 as Document No. 9334986, which would pass by operation of law." The Notice of Permission stated that the "public" had a "right" to use the described property for recreational purposes during daylight hours, but that no vehicles were permitted on the property.

At the same time, McCaffrey sent a letter to the Association, informing them that "[s]ince we acquired ownership, we have observed that unauthorized vehicular entries are occurring across our property toward the river. This poses a serious liability issue for us and the prospect of environmental harm. Accordingly, we intend to erect a new barrier . . . to prevent vehicular access across our property. [¶] As a good neighbor gesture, we will provide Sumner Hill residents and other members of the public pedestrian access to the river for recreational enjoyment. Accordingly, to protect our legal rights and to minimize liability, we will be recording a Notice of Permission to Use Land under Civil Code Section 813 and posting the principal entry to our property. . . . No vehicular access will be allowed and the restrictions shown in the recorded notice will apply."

Soon thereafter, a new locked gate was installed by defendant near the top of Killkelly Road that prevented vehicular access. Defendant also hired private security guards to patrol for trespassers on defendant's property and to prevent vehicular access to the river from Killkelly Road. Sumner Hill homeowner David Kaye testified of several incidents in which he attempted to use Killkelly Road in the evenings (such as for jogging or walking) and was accosted by the security guard and told that he had to leave. Other homeowners had similar experiences. Ultimately, many of the homeowners just stopped going to the river. As homeowner Susan Early put it, defendant's gate on Killkelly Road, the Notice of Permission posted on the gate and the presence of security guards "turned what had been a place of respite and healing into a battle ground."

In August 2005, an attorney for the Association wrote a letter to McCaffrey, which set forth the position that the Association owned the subdivision roads, including Killkelly Road, and enclosed a copy of the 1995 grant deed from the County purporting to convey a fee interest in the Sumner Hill road system to the Association. The letter insisted that the residents of Sumner Hill had a right of access to the river from Killkelly Road and challenged McCaffrey to prove otherwise.

On October 23, 2005, the Association held its annual meeting. Since McCaffrey and his wife purchased a lot in the subdivision earlier that year, they attended the meeting. At the meeting, numerous homeowners voiced objections to McCaffrey about defendant's denial of their right of access to the river from Killkelly Road. They also objected to defendant's plan to open their private, gated community to the general public. They realized that the Peck Ranch property would be developed, but they wanted to protect what they had (i.e., a private, gated subdivision with an unrestricted right of access to the river from Killkelly Road). McCaffrey spoke, answered questions and tried to explain his position. He said he could not help what had been represented to homeowners when they purchased their lots. He claimed that his company now owned Killkelly Road and could lawfully develop access through the subdivision down to the San Joaquin River. He also expressed his view that the public had a legal right of access to the river. He invited the homeowners to cooperate with him regarding the way the development would take shape. Ultimately, both sides stated their positions respectfully, but neither side gave ground.

A week or two later, McCaffrey called to see if he could work things out with the homeowners. He met with homeowners Eric Fogderude, Michael Seng and Gary Christy over lunch. Fogderude told McCaffrey the homeowners were not trying to stop his development as long as it did not interfere with their "core issues of a private gated community and . . . unrestricted rights down to the river." McCaffrey presented copies of his updated plans that depicted a trail going through the Sumner Hill subdivision and a winery/restaurant at the river with access through the subdivision. The planned trail would use portions of Killarney Drive and all of Killkelly Road in order to reach the river. The three homeowners responded that such a proposal was unacceptable.

*The Pleadings*

Plaintiffs, consisting of several of the individual homeowners and the Association, filed their lawsuit in April 2006 against defendants. Plaintiffs' operative pleading at the time of trial was their second amended complaint.[17] Among other things, the second amended complaint sought the following declaratory relief: that each owner of a lot in the 49-Lot area had a private easement over all the roads shown on the Amended Map, including Killkelly Road; that defendant had no right to install the gate on Killkelly Road or to restrict plaintiffs' access to the river; that Outlots A through D must not be used for purposes other than open space or agricultural use; that the

---

[17] A third amended complaint was subsequently filed, which more explicitly emphasized plaintiffs' contention that they were seeking to protect their right to maintain the private, gated nature of the subdivision.

Association owned all of the roads in the subdivision, including Killkelly Road; that any right defendant may have as owner of the Peck Ranch property to pass through the subdivision to reach Outlots C and D did not include a right to expand that access to include the general public; and that any right the general public had to access the San Joaquin River could best be accomplished through alternative routes, such as an access path through the Freelses' property (the adjacent land to the north of the Sumner Hill subdivision). Plaintiffs' second amended complaint also sought damages for tort causes of action, such as alleged slander of title regarding plaintiffs' easement rights to use Killkelly Road.

Defendants cross-complained, seeking declaratory relief and reformation of the Amended Map, which they claimed was invalid because it did not expressly provide for public access to the San Joaquin River. At the time of trial, defendants' operative pleading was their first amended cross-complaint. The cross-complaint alleged, among other things, that the failure of the Amended Map to expressly provide an access way to the river contravened California law, including section 66478.4, thereby rendering the Amended Map defective. The relief sought included a request that the trial court issue a decree reforming the Amended Map "to provide for public access or a public easement to the River through the Subdivision" using Killkelly Road.

On October 30, 2006, the trial court granted a preliminary injunction ordering defendants to immediately remove the gate installed by defendant(s) on Killkelly Road and to refrain from interfering with plaintiffs' (or other homeowners') access to the San Joaquin River from Killkelly Road. Defendants promptly complied.

*Trial Proceedings, Statement of Decision and Jury Verdict*

The trial was bifurcated between the parties' equitable claims (tried to the court) and damage claims (tried to a jury). The court trial began in January 2008, lasted approximately 20 days, and included the trial court's firsthand viewing of the property, testimony from over 30 witnesses, and introduction of hundreds of documents into evidence. The parties argued the issues at length, filed pre- and posttrial briefs and filed objections to the trial court's proposed tentative decision. On July 21, 2008, the trial court issued a 95-page statement of decision on the parties' equitable claims.

In its statement of decision, the trial court made a number of key findings, including as follows:

1. The Sumner Hill subdivision comprised the 49-Lot area, the Outlots and the subdivision roads, all as depicted on the Amended Map.

2. Defendants owned fee title to the subdivision roads, but plaintiffs had easement rights to use all of the roads, including use of Killkelly Road for pedestrian and vehicular access to the San Joaquin River.

3. Plaintiffs had a right to maintain Sumner Hill as a private, gated subdivision, which included the right to exclude the general public from the subdivision.

4. Defendants were not restricted from developing Outlots A through D, but could only do so in a manner consistent with the rights of the owners of the 49 lots to maintain the character of the 49-Lot area as a private, gated subdivision. In developing Outlots A through D, defendants would have two alternative approaches. Defendants could create residential lots in Outlots A through D that would be an extension (or subsequent phase) of the private, gated, fenced community of the 49-Lot area, in which case the residential development in Outlots A through D would be under the Sumner Hill CC&R's and its residents would have access to the river. Alternatively, defendants could develop Outlots A through D as "outside" or separate from the existing, gated, fenced 49-Lot area as a distinct residential development, but the residents of that outside development would not be under the Sumner Hill CC&R's and would not have access to the river through the 49-Lot area.[18]

5. Although the subdivision borders on the San Joaquin River and the river was a navigable waterway at that point, and thus the Amended Map was supposed to provide for public access to the river under sections 66478.4 and 66478.5, defendants' claim (that the Amended Map was defective for failure to provide such access) was barred by the doctrine of laches.

Thereafter, and prior to the second phase of the trial on the parties' damage claims, the trial court issued an order determining that attorney fees and costs were an element of damages in plaintiffs' slander of title claim, which would be presented to the jury for determination.

The jury trial phase of the case relating to the parties' damage claims occurred in April and May 2009. It lasted 12 court days, with the jury personally viewing the property and hearing the testimony of over 30 witnesses. Closing arguments lasted two full days. The jury found in favor of plaintiffs on the slander of title and nuisance causes of action and awarded compensatory damages to plaintiffs in the total sum of $803,951. The jury also found malice on the part of Rio Mesa Holdings, LLC, and imposed punitive damages against that defendant in the sum of $2,419,800.

---

[18] Of course, implicit in the trial court's determination was that any development would require the necessary approvals by the County or other applicable agencies.

On July 22, 2009, a judgment was entered incorporating the trial court's statement of decision and the jury verdicts. This appeal and cross-appeal followed.

## ISSUES ON APPEAL

We briefly summarize the main issues raised by the parties in the appeal and cross-appeal. Defendants' appeal claims the trial court reversibly erred by (1) applying the defense of laches to defeat the public's right of access to the San Joaquin River; (2) deciding that Sumner Hill was a private, gated subdivision from which the public could be excluded; (3) finding that plaintiffs have easement rights to use Killkelly Road for access to the river; (4) concluding that Outlots A through D were subject to the development restrictions contained in the Sumner Hill CC&R's; (5) allowing the jury to award damages for slander of title in this case; and (6) failing to reduce the amount of the punitive damage award in light of due process considerations.

Plaintiffs' cross-appeal claims the trial court erred by (1) holding that defendants have fee title ownership of the roads in the subdivision; (2) failing to apply the statute of limitations defense to defendants' public access claim under the Subdivision Map Act; and (3) holding that, but for the defense of laches, defendants would otherwise have a valid claim of public access under the Subdivision Map Act. On this latter point, plaintiffs contend the alleged claim of public access failed because the river was not navigable as a matter of law.

Because of the overlap of issues in the appeal and cross-appeal, we have elected to group related issues and contentions together, according to subject matter.

## DISCUSSION

I. *Public Access to the River Through the Sumner Hill Subdivision*

We begin with defendants' claim to establish a public access route to the San Joaquin River through the Sumner Hill subdivision. Defendants' first amended cross-complaint alleged that the Amended Map was invalid because it did not expressly provide a means of public access to the river as required by section 66478.1 et seq. The relief sought by defendants included a request that the trial court reform or amend the Amended Map "to provide for public access or a public easement to the River through the Subdivision." The trial court denied such relief, holding that while defendants' claim was otherwise correct, it was barred by the defense of laches. Defendants contend on appeal that the trial court erred in applying the defense of laches to a public right. In

their cross-appeal, plaintiffs argue that the Amended Map was not subject to the referenced statutory provisions because the river was not "navigable" where it bordered the subdivision and, in any event, defendants' claim was time-barred by the statute of limitations. Finally, in responding to plaintiffs' cross-appeal, defendants assert a new theory on appeal relating to their basis for public access.

We shall address the issues pertinent to defendants' public access claim in the following order: (1) navigability, (2) statute of limitations (rather than laches), and (3) defendants' new theory on appeal. But first, we provide a summary of the relevant constitutional and statutory provisions that protect public access to the public waters of this state.

### A.   Overview of Constitutional and Statutory Provisions

The California Constitution provides: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof." (*Id.*, art. X, § 4.) This constitutional protection of public access to navigable waters was first adopted in 1879 as then article XV, section 2, and is now found in article X, section 4 of the California Constitution. (*State of California v. Superior Court (Lyon)* (1981) 29 Cal.3d 210, 227 & fn. 15 [172 Cal.Rptr. 696, 625 P.2d 239].)

In order to implement this constitutional provision, in 1974 the Legislature enacted section 66478.1 et seq., which addressed the subject of public access to public waters in the context of the approval of subdivision maps by local agencies. (Stats. 1974, ch. 1536, § 4, p. 3464, operative Mar. 1, 1975.)[19] These public access provisions comprise article 3.5 of chapter 4 of the Subdivision Map Act. (Cf. §§ 66410, 66478.1 et seq.) The Legislature expressed its principal concerns and objectives in passing the public access requirements of the Subdivision Map Act: "The Legislature finds and declares that the public natural resources of this state are limited in quantity and that the population of this state has grown at a rapid rate and will continue to do so, thus increasing the need for utilization of public natural resources. The increase in population has also increased demand for private property adjacent to public natural resources through real estate subdivision developments which resulted

---

[19] Section 66478.1 states that the Legislature's intention in adopting sections 66478.1 through 66478.10 was to "implement Section 4 of Article X of the California Constitution" regarding the state's "navigable waters."

in diminishing public access to public natural resources." (§ 66478.2.) "The Legislature further finds and declares that it is essential to the health and well-being of all citizens of this state that public access to public natural resources be increased. It is the intent of the Legislature to increase public access to public natural resources." (§ 66478.3.)

Section 66478.4, subdivision (a), provides the means of accomplishing these goals by imposing the following requirement: "No local agency shall approve either a tentative or a final map of any proposed subdivision to be fronted upon a public waterway, river, or stream which does not provide, or have available, reasonable public access by fee or easement from a public highway to that portion of the bank of the river or stream bordering or lying within the proposed subdivision." Section 66478.5, subdivision (a), requires an additional easement "along a portion of the bank of the river or stream bordering or lying within the proposed subdivision." The aforesaid public access route or routes to a public waterway and the easement along the bank of the public waterway "shall be expressly designated on the tentative or final map, and this map shall expressly designate the governmental entity to which the route or routes are dedicated and its acceptance of the dedication." (§ 66478.6.)

Section 66478.8 allows that alternative access near the subdivision may be sufficient in some cases. It states: "Nothing in Sections 66478.1 to 66478.10, inclusive, of this article shall require a local agency to disapprove either a tentative or final map solely on the basis that the reasonable public access otherwise required by this article is not provided through or across the subdivision itself, if the local agency makes a finding that the reasonable public access is otherwise available within a reasonable distance from the subdivision and identifies the location of the reasonable public access. [¶] The finding shall be set forth on the face of the tentative or final map." (§ 66478.8; see, e.g., *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1216–1217 [217 Cal.Rptr. 125] [§ 66478.8, along with §§ 66478.4, 66478.5, must be construed to maximize access to navigable rivers of our state].)

By their own terms, the sections of the Subdivision Map Act discussed above are designed to protect public access to the state's *public* waters. Thus, the statutory definition of what constitutes a public waterway, river or stream is foundational to our analysis. Section 66478.4, subdivision (c), provides that needed definition. It states that a "public waterway, river or stream" for purposes of sections 66478.4, 66478.5, and 66478.6 means "*those waterways, rivers and streams defined in Sections 100 through 106 of the Harbors and*

*Navigation Code.*" (§ 66478.4, subd. (c), italics added.)[20] Harbors and Navigation Code section 100 specifies that public waterways, rivers or streams are those that are *navigable.*[21] Harbors and Navigation Code sections 101 through 106 then expressly list a number of rivers, streams and other waters, or portions thereof, that are declared by the Legislature to be navigable. The statutory listing is not exhaustive, and a river or other waterway may be found to be navigable in fact even if it is not mentioned in sections 101 through 106 of the Harbors and Navigation Code. (*People ex rel. Baker v. Mack* (1971) 19 Cal.App.3d 1040, 1048–1049 [97 Cal.Rptr. 448].)

The San Joaquin River is one of the rivers listed by name in the Harbors and Navigation Code provisions addressing navigability. Section 105 of that code states: "The following streams and waters are also navigable and are public ways: [¶] . . . [¶] San Joaquin River, between its mouth and Sycamore Point." Thus, the statute expressly declares the San Joaquin River to be navigable to a certain point—Sycamore Point. It is undisputed that the segment of the river bordering the Sumner Hill subdivision is *above* Sycamore Point. This fact raises an important question of statutory construction: Does the legislative declaration that the river is navigable to a certain point mean, by implication, that the river is declared nonnavigable above that point? Indeed, plaintiffs make that very argument, which we explain below in our discussion of navigability.

B. *The Issue of Navigability*

As our summary of the law has shown, the applicability in this case of the constitutional and statutory provisions relied on by defendants to support their claim of public access depend on the river's navigability. Unless the San Joaquin River is navigable where it borders on the subdivision, defendants' claim must fail as a matter of law.

Plaintiffs argue that the river is nonnavigable based on Harbors and Navigation Code section 105. They contend that we should apply the maxim

---

[20] Other, more specialized, categories of "public" waterways are also set forth in section 66478.4, subdivision (c). These relate to portions of rivers designated as public highways for fishing, or set aside by statute as spawning areas of certain species, or which are downstream from certain state or federal hatcheries of certain species. Nothing in the record suggested that the segment of the river adjacent to Sumner Hill was a public waterway under these specialized criteria, nor did any party make such a claim. Rather, the sole determinative question was that of navigability.

[21] That is not surprising, since the public access protections set forth in article X, section 4 of the California Constitution (which the Legislature sought to implement in the access provisions of the Subdivision Map Act—see § 66478.1), refer only to *navigable* waters. (See also *State of California v. Superior Court (Lyon), supra,* 29 Cal.3d at p. 227 [constitutional provision applies to "waters that are navigable"].)

of statutory construction that says *expressio unius est exclusio alterius*, meaning that " '[t]he expression of some things in a statute necessarily means the exclusion of other things not expressed.' " (*Lake v. Reed* (1997) 16 Cal.4th 448, 466 [65 Cal.Rptr.2d 860, 940 P.2d 311], quoting *Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 [25 Cal.Rptr.2d 500, 863 P.2d 745].) In other words, by expressly addressing the issue of navigability of the San Joaquin River and delineating the portion of the river deemed navigable (see Harb. & Nav. Code, § 105), the Legislature meant to exclude the remainder of the river from that classification.

Moreover, plaintiffs point out that this issue of statutory construction of our state's navigability statutes was long ago decided by our Supreme Court in *American River Water Co. v. Amsden* (1856) 6 Cal. 443 (*American River Water Co.*), a case that turned on the question of whether a portion of the American River was navigable. In deciding that question, the Supreme Court considered the predecessor statutes to the Harbors and Navigation Code provisions now before us. The relevant statute had described the American River as being navigable up to a particular point below the dam owned by the plaintiffs. The Supreme Court found this legislative declaration on navigability to be dispositive: "In regard to the river under consideration, the statute declares it to be navigable up to a point which is below the dam of the plaintiffs. *Thus by implication it is declared non-navigable above that place.*" (*American River Water Co., supra*, at p. 446, italics added.) The identical statutory interpretation was applied in *Ford v. County of Butte* (1944) 62 Cal.App.2d 638 [145 P.2d 640] (*Ford*), where the Court of Appeal concluded that a portion of the Feather River was not navigable because Harbors and Navigation Code section 102 declared the river to be navigable up to a certain point, and the area of the river at issue was above that point. (*Ford, supra*, at p. 641.)

Plaintiffs argue that we should follow the statutory interpretation adopted by *American River Water Co.* and followed in *Ford*. That is, when Harbors and Navigation Code section 105 declared the San Joaquin River to be navigable up to Sycamore Point, by a clear implication it declared the river to be *nonnavigable* above that point. Plaintiffs' argument continues: Since the San Joaquin River where it borders the Sumner Hill subdivision is above Sycamore Point, that segment of the river is not navigable and, therefore, the public access requirements of section 66478.4 were inapplicable to the Amended Map.

Defendants counter that *American River Water Co.* was decided before the 1879 adoption of the constitutional provision protecting access to navigable waters. (See Cal. Const., art. X, § 4, formerly art. XV, § 2.) In light of that subsequent constitutional enactment, they argue *American River Water Co.* is

no longer good law. Instead, according to defendants, section 66478.4 and Harbors and Navigation Code section 105 should be liberally construed to protect public access to any portion of the river shown to be navigable in fact. In this regard, defendants contend that the true test of navigability is a factual one that looks to whether a canoe or other small boat may be floated on it. (See *People ex rel. Baker v. Mack, supra,* 19 Cal.App.3d at p. 1044.) Since there was evidence of such canoe usage on the river where it bordered the subdivision, defendants argue that navigability and a concomitant right of public access were thereby established.

The trial court agreed with defendants' position. It held: "[T]he Court must give liberal construction to the Subdivision Map Act as it applies to public access to waterways, which must trump the maxim of statutory interpretation and *American River Water* (inasmuch as it was decided before Article X, Section 4, was added to the Constitution). Because the segment of the San Joaquin River which borders the Sumner Hill subdivision is navigable in fact, the Court finds that such segment of the San Joaquin River *is a navigable river or stream within the meaning of Section 66478.1.*"

We decline to decide the issue of navigability in this case because, as will be seen, other issues are ultimately dispositive. Nevertheless, we believe it is important to call attention to a basic uncertainty in the law of navigability that has emerged in this case, which is arguably in need of correction or clarification by either the Legislature or the Supreme Court. We now further explain the nature of the problem.

Though decided in 1856, *American River Water Co.* arguably remains binding precedent because it has not been overruled and, as noted below, was applied by the Supreme Court even after the 1879 constitutional provision. As an intermediate court, we are bound to follow Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] [subordinate courts must follow decisions of Supreme Court].) To reiterate, *American River Water Co.* held that when the relevant statute (the provision identifying navigable waters) declared the American River to be navigable up to a certain point, by clear implication it declared the river to be nonnavigable above that point. (*American River Water Co., supra,* 6 Cal. at p. 446.) If we applied that statutory construction to Harbors and Navigation Code section 105 in the present case, it would obviously lead to the conclusion that the San Joaquin River was not navigable at the location of the subdivision.

Defendants' position is that because *American River Water Co.* was decided *before* the adoption of the 1879 constitutional provision regarding public access to navigable waters (Cal. Const., art. X, § 4, formerly art. XV,

§ 2), it is no longer controlling authority. We fail to see how the 1879 constitutional provision would necessarily require a rejection of the statutory interpretation adopted in *American River Water Co.* Moreover, in *Cardwell v. County of Sacramento* (1889) 79 Cal. 347 [21 P. 763] (*Cardwell*), decided 10 years after the constitutional provision was in place, the Supreme Court explicitly applied the statutory construction announced in the *American River Water Co.* case. (*Cardwell, supra,* at pp. 349–350.)[22] In *Cardwell,* after first commenting on the plaintiff's general failure to allege the river was actually navigable, the Supreme Court emphasized the overriding importance of the Legislature's declaration of nonnavigability: "But however this may be, the words [(i.e., 'navigable streams')] certainly cannot be held to include streams which have been in effect declared by the legislature to be non-navigable." (*Cardwell, supra,* at p. 349.) Although not decisive of the issue, the fact that *Cardwell* was decided after the 1879 constitutional provision was adopted and expressly applied the statutory construction articulated in *American River Water Co.,* weighs against defendants' position. *Cardwell* further illustrates that we must not disregard the Legislature's *statutory* declarations of the navigability of certain rivers and streams. Although navigability may be a factual issue for the courts to decide, it may also be declared by the Legislature. (*San Francisco v. Main* (1913) 23 Cal.App. 86, 88 [137 P. 281].)

In *American River Water Co.* and *Cardwell,* the rivers were found to be nonnavigable both "in fact" *and* by implied legislative declaration. In our case, the lower court determined that the relevant area of the San Joaquin River was navigable in fact despite the Legislature's apparent declaration by implication that it is nonnavigable above Sycamore Point, where this subdivision lies. We have found no cases which address this anomalous circumstance, where, under the rule of *American River Water Co.,* the Legislature has declared a portion of a river to be nonnavigable, when that same portion of the river is determined to be navigable in fact. In the instant case, if we were to find the river navigable, we would not only be disregarding Supreme Court precedent but holding that factual evidence on navigability trumps the apparent legislative intent. On the other hand, if we were to find the river to be nonnavigable, we would be ignoring the trial court's finding, supported by substantial evidence, that the river is in fact navigable. In this unique case, the two accepted standards of navigability—factual and statutory—have directly collided. Each standard yields the opposite result as to the same portion of the river. We believe this incongruity in the law of navigability is best resolved by the Legislature or the Supreme Court, and we urge them to do so.

---

[22] Although *Cardwell* continued to apply the statutory construction given to the navigability statutes in *American River Water Co.,* it did not expressly address the effect, if any, of the 1879 constitutional provision on the statutory construction of those statutes.

In any event, it is unnecessary for us to decide the navigability issue, because even assuming (without deciding) that the river is navigable, defendants' claims fail on other grounds as we explain below.

### C.  *Statute of Limitations*

Plaintiffs argue that defendants' claims of public access under the provisions of the Subdivision Map Act were barred by the applicable statute of limitations set forth in section 66499.37. We agree.

■ Section 66499.37 of the Subdivision Map Act stated, at the time defendants' filed their cross-complaint in 2006, as follows: "Any action or proceeding to attack, review, set aside, void or annul the decision of [a] legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within *90 days* after the date of such decision. *Thereafter all persons are barred from any such action or proceeding* . . . ." (Italics added.)[23] The 90-day time period in section 66499.37 operates as a statute of limitations and compliance is mandatory. (*Sprague v. County of San Diego* (2003) 106 Cal.App.4th 119, 128 [130 Cal.Rptr.2d 517].)

This statute of limitations applies broadly to "*any* action involving a controversy over or arising out of the Subdivision Map Act." (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 23 [32 Cal.Rptr.2d 244, 876 P.2d 1043] (*Hensler*).) In this regard, courts look to the gravamen of the action, not its form. (*Id.* at pp. 22–23.) As noted in *Hensler*, "Every appellate decision which has considered the issue in a case involving a controversy related to a subdivision has held that section 66499.37 is applicable no matter what the form of the action." (*Id.* at pp. 26–27 [cases summarized].) "The broad language the Legislature employed within section 66499.37 was specifically designed to include any challenge, regardless whether procedural or substantive in character, to any subdivision-related decision of either a legislative or advisory entity, or any of the necessary precedent proceedings, acts or determinations pursued before the making of the challenged decision." (*Presenting Jamul v. Board of Supervisors* (1991) 231 Cal.App.3d 665, 671 [282 Cal.Rptr. 564].) The "key factor" is that the action attacked or sought review of a decision of a local legislative or advisory body relating to a subdivision under the Subdivision Map Act. (*Friends of Riverside's Hills v.*

---

[23] In 2007, the Legislature amended section 66499.37 to clarify that the 90-day statute of limitations includes, but is not limited to, any challenge to the validity of the approval of a tentative or final map. (Stats. 2007, ch. 612, § 9.)

*City of Riverside* (2008) 168 Cal.App.4th 743, 751 [85 Cal.Rptr.3d 695]; accord, *Anthony v. Snyder* (2004) 116 Cal.App.4th 643, 655–656 [10 Cal.Rptr.3d 505].)

█ Defendants' cross-complaint alleged the Amended Map was defective when the County approved it because the map failed to provide a route for public access, by fee or easement, through the subdivision to the bank of the San Joaquin River as required by section 66478.4. Defendants sought a judicial declaration that the Amended Map was defective, as well as a decree reforming or amending the map to provide for public access through the subdivision. Indeed, the record reflects that the impropriety of the County's approval of the Amended Map was a basic theme of defendants' case in the trial court, and was consistently asserted by defendants in their argument and briefing below. Because defendants' claims challenged or sought review of a decision of a local legislative body relating to a subdivision under the Subdivision Map Act, section 66499.37 was clearly applicable.[24] We conclude that defendants' claims of public access through the Sumner Hill subdivision under the Subdivision Map Act were barred by the statute of limitations.[25]

█ In reaching this conclusion, we do not minimize that public access rights are a matter of constitutional protection. While it is true that article X, section 4 of the California Constitution protects access to navigable waters, that section also explicitly calls for legislative implementation. With respect to the precise context before us, the Legislature has plainly done so. The implementing legislation applicable to whether public access must be provided through a particular proposed subdivision, where a tentative or final map is submitted to a local agency for approval, is article 3.5 of chapter 4 of the Subdivision Map Act (§ 66478.1 et seq.). In section 66478.1, the Legislature stated its intent that "the provisions of Sections 66478.1 through 66478.10 . . . implement Section 4 of Article X of the California Constitution [as applicable to] navigable waters." Here, defendants' claim was based on the County's failure to comply with these public access provisions in the Subdivision Map Act, specifically section 66478.4, and therefore the statute of limitations for Subdivision Map Act claims was applicable.    █    Moreover, it is well established that a statute of limitations is enforceable even though constitutional rights may be involved: "[E]ven a constitutional right is subject to reasonable statutory periods of limitation within which to commence an action for its vindication." (*Timberidge Enterprises, Inc. v. City of*

---

[24] The trial court found these claims were barred by the defense of laches. Since we hold defendants' claims were barred by the statute of limitations, we find it unnecessary to separately address laches.

[25] In failing to apply the statute of limitations in section 66499.37, the trial court erred. However, in concluding the claims were barred on other grounds (laches), the eventual result reached by the trial court was correct.

*Santa Rosa* (1978) 86 Cal.App.3d 873, 886 [150 Cal.Rptr. 606]; accord, *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 846 [73 Cal.Rptr.2d 427].) That was the case here.

### D.  *Defendants' New Theory*

As discussed above, plaintiffs' cross-appeal successfully demonstrated the statute of limitations barred defendants' public access claims under the Subdivision Map Act. Defendants, in their responsive brief on appeal, expressly *abandoned* all claims that the Amended Map was defective or that it violated the Subdivision Map Act. In a surprising change of position raised for the first time on appeal, defendants now contend that the County did nothing wrong when it approved the Amended Map and that *all along* the map provided the required public access route in compliance with the Subdivision Map Act. Under this new theory, the trial court's error was its failure to recognize this and interpret the Amended Map accordingly.[26]

Defendants' eleventh-hour turnabout cannot withstand judicial scrutiny because it was not presented in the trial court below and it would be unfair to allow defendants to reinvent the case on appeal. At every step of this case, from the filing of the cross-complaint, law and motion proceedings, a lengthy court and jury trial, closing argument, and request for statement of decision, defendants affirmatively attacked the validity of the Amended Map because it did not provide public access to the river and they asked the trial court to remedy that situation. This theory of the case was conspicuously evident in the closing argument of defendants' attorney, Patrick Gunn, who acknowledged that he "carefully prepared this case on the Subdivision Map Act issues" as defendants' "Subdivision Map Act guy." In the closing argument of the court trial, when discussing the fact that "the map does not currently provide or have available reasonable public access," Gunn affirmed there "doesn't seem to be any dispute on that [issue]," since "nobody takes the position that Exhibit 193[, the Amended Map,] currently contains an express dedicated easement to the public from the front gate down to the river where it fronts on Outlot D." Gunn categorically argued to the court that "the evidence that Your Honor heard at trial, if it showed anything, showed that Madera County made a mistake." Summarizing defendants' position, he stated: "[C]ontrary to the California Constitution, contrary to implementing state law, the County approved a subdivision map, this map, Exhibit 193. It failed to provide reasonable access or fee—by fee or easement over Road 204 through the subdivision to the bank of the river where the river fronted up against Outlot D." To rectify the County's failure to comply with the law,

---

[26] Presumably, under this theory, the County's failure related to its subsequent actions such as vacating the roads.

Gunn insisted that it was "time for the Court to correct that mistake" and thereby provide for the required public access to the river by judicial declaration.[27]

Later, in defendants' request for a statement of decision, they specifically asked for a finding on the question of whether the County was "barred from approving the Amended Map at the time it was presented for approval because the map failed to provide for, or have available, reasonable public access to the River . . . ."[28] When defendants submitted to the trial court their proposed statement of decision, the document included a proposed finding that the Amended Map was in fact "defective at the time that it was recorded because it [failed] to provide for or have available reasonable public access" to the river. In short, there is no question as to the theory on which the case was tried below regarding defendants' public access claims. That theory, from defendants' standpoint, was that the County should not have approved a map that failed to provide for the required public access route, and that the County's "mistake" needed to be judicially rectified.

Applying the " 'theory of trial' " doctrine, we will not consider defendants' new theory on appeal. "Where the parties try the case on the assumption that . . . certain issues are raised by the pleadings, [or] that a particular issue is controlling, . . . neither party can change this theory for purposes of review on appeal. [¶] This doctrine of 'theory on which the case was tried,' referred to more briefly as 'theory of trial,' is a well-established rule of appellate practice." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 407, pp. 466–467 [cases digested].) The doctrine is also applied where the parties assumed the applicability of a particular statute (*id.*, § 412, p. 470), or where "the evidence offered and authorities submitted in a trial are directed solely to establishment of a particular legal relationship or legal doctrine of liability or defense" (*id.*, § 413, p. 470). To permit a change of position in the appeal "would, in most cases, be highly prejudicial and accordingly is not permitted." (*Id.*, § 413, pp. 470–471; accord, *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29 [21 Cal.Rptr.2d 104] [trial based on time of discovery of relevant defect for purposes of applying statute of limitations; on

---

[27] In asking the trial court to correct the County's failure to comply with the law, Gunn requested that the trial court either reform the map or simply "interpret" the map "in the manner to allow public vehicular access through the subdivision, down the existing road system over Killarney and then down Killkelly over to the river." Contrary to defendants' suggestion, the request that the trial court "interpret" the map to provide—by judicial fiat—for public access is *not* the same as taking the position that the Amended Map complied with the Subdivision Map Act all along. At no time did defendants argue below that the Amended Map complied with the public access requirements of the Subdivision Map Act.

[28] The trial court declined to make a finding on this issue because it entailed a discretionary decision that belonged to the County, which was not a party to the action.

appeal from summary judgment for the defendant, the plaintiff was not permitted to change theory of the nature of defect involved to show statute of limitations had not run].)

Here, defendants' new position is contrary to the theory on which the case was tried below. As noted, defendants' consistent position before, during and after the trial was that the Amended Map failed to comply with the public access requirements of the Subdivision Map Act, and it asked the trial court to grant appropriate relief. With the issues so framed, plaintiffs' focus and emphasis at trial was on establishing lack of navigability and on defenses such as the statute of limitations. Neither party contended that the Amended Map complied with the Subdivision Map Act regarding the matter of public access, and it was apparently assumed that the map did not comply. Thus, there was no opportunity during the trial for the parties or the trial court to consider the ramifications of such a position or how it might relate to other issues, evidence or arguments presented in the case. Moreover, defendants' new theory was advanced in this appeal only after it became apparent that their original theory was barred by the statute of limitations. Under all the circumstances, it would be fundamentally unfair to allow defendants to shift their position and claim on appeal that the Amended Map was compliant all along. " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1351, fn. 12 [82 Cal.Rptr.3d 229, 190 P.3d 586]; *Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715].)

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V. *The Slander of Title Claim*

At the time of the jury trial of the damage claims, plaintiffs' operative pleading was their third amended complaint. It alleged that defendant's gate across Killkelly Road was a private nuisance that damaged the individual plaintiffs by interfering with the use and enjoyment of their easement rights. The third amended complaint *also* alleged that by recording the Notice of Permission, defendants slandered the title of plaintiffs' easement rights to use Killkelly Road without restriction and the right to maintain a private, gated subdivision. In the Notice of Permission, Rio Mesa Holdings, LLC, had

---

* See footnote, *ante*, page 999.

asserted control over the use of Killkelly Road, restricted access to daytime hours (but included the general public in that permitted use), and did not allow vehicles.

The trial court instructed the jury on the elements of nuisance and slander of title, and informed the jury of the findings on property rights made by the trial court, including the existence of plaintiffs' easement rights to use Killkelly Road. With respect to the slander of title cause of action, the jury was told that plaintiffs had to prove, among other things, that the publication "caused actual pecuniary damage in the form of expense for measures reasonably necessary to counteract the publication, including litigation expenses to remove the doubt cast upon [plaintiffs'] property rights." The trial court informed the jury that the only damages sought by plaintiffs for slander of title were attorney fees and costs. The jury was instructed that litigation costs and attorney fees were recoverable damages in a slander of title cause of action "if the other elements of a slander of title claim are met."

The jury returned special verdicts in favor of plaintiffs and awarded compensatory damages to plaintiffs on the private nuisance and slander of title causes of action. The jury also found malice on the part of Rio Mesa Holdings, LLC, and awarded punitive damages to plaintiffs against that defendant. Plaintiffs' compensatory damages for slander of title consisted solely of their attorney fees and litigation costs. A comprehensive judgment was entered that included those damage awards.

On appeal, defendants contend the judgment awarding damages for slander of title must be reversed because, as a matter of law, two elements of a valid slander of title cause of action were lacking in this case: (1) marketable title to the easement rights, and (2) pecuniary damage to the salability of the property. Further, defendants argue that even if plaintiffs were entitled to recover damages for slander of title, (3) the attorney fees and costs should have been allocated or apportioned. We will address each of these contentions in turn.

### A. *Plaintiffs' Title Sufficient*

Defendants argue the property rights they slandered—plaintiffs' implied and equitable easement rights to use Killkelly Road to get to the river—were inadequate to constitute "title" to support a claim for slander of title. We disagree.

Defendants' argument that title was inadequate to support the cause of action is premised on two cases, *Howard v. Schaniel* (1980) 113 Cal.App.3d 256 [169 Cal.Rptr. 678] and *Hill v. Allan* (1968) 259 Cal.App.2d 470 [66

Cal.Rptr. 676]. Those cases are distinguishable because the alleged title involved was claimed by adverse possession or prescription where no court had yet adjudicated the existence of such property rights. As explained in *Howard v. Schaniel*: "A title acquired by adverse possession is not a marketable title until the title is established by judicial proceedings against the record owner . . . ." (*Howard v. Schaniel, supra,* at p. 264.) Because the thrust of a slander of title cause of action is "protection from injury to the salability of property," and an adverse possessor's claimed rights are not marketable until established by a court, the plaintiffs alleged property rights in that case were insufficient to support a slander of title action. (*Id.* at pp. 264–265; accord, *Hill v. Allan, supra,* at pp. 490–491 [right to a prescriptive easement not yet established in court action—no slander of title].)

Here, no judicial action was necessary to perfect or establish plaintiffs' easement rights. Rather, plaintiffs' rights accrued and vested when they purchased their lots because (1) their deeds referenced a subdivision map with a system of roads, including Killkelly Road (see *Danielson v. Sykes* (1910) 157 Cal. 686 [109 P. 87]), and (2) Sumner-Peck, Wells Fargo and their sales agents made promises of river access to plaintiffs or their predecessors during the marketing of the residential lots. (See *Bradley v. Frazier Park Playgrounds* (1952) 110 Cal.App.2d 436, 442–443 [242 P.2d 958].) Moreover, for reasons we have explained earlier in the unpublished part of this opinion, the vacation of the subdivision roads did not cause the extinguishment of plaintiffs' easement rights under Streets and Highways Code section 8353. We conclude that plaintiffs possessed marketable "title" to their easement rights, and therefore defendants' argument fails.

### B.  *Pecuniary Damage Element Satisfied*

Next, defendants contend that plaintiffs failed to establish the pecuniary damage element of the slander of title cause of action. Specifically, defendants argue that this element is only satisfied by evidence of actual loss to salability of the property, and that expenditure of attorney fees and costs *by themselves* are insufficient. Plaintiffs counter that attorney fees and litigation costs that are necessary to clear title of a disparaging document are sufficient to satisfy the pecuniary damage element, and that in any event there was some evidence of diminished value.[46] Discussion of this issue will require an overview of the nature of the cause of action.

---

[46] The jury did not find any damages other than attorney fees and costs, nor were they asked to do so. Since it is clear the only damages found and awarded by the jury were the attorney fees and costs, we do not base our holding on the purported evidence of diminished value. There was brief testimony by one or two of the homeowners stating their personal belief that the recorded Notice of Permission and/or defendant's gate diminished the value of their land.

■ Slander or disparagement of title occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes the owner thereof " 'some special pecuniary loss or damage.' " (*Fearon v. Fodera* (1915) 169 Cal. 370, 379–380 [148 P. 200].) The elements of the tort are (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss. (*Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75, 84 [61 Cal.Rptr.2d 497]; *Howard v. Schaniel, supra*, 113 Cal.App.3d at pp. 263–264 & fn. 2.) If the publication is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title. (*Hill v. Allan, supra*, 259 Cal.App.2d at p. 489.) The main thrust of the cause of action is protection from injury to the salability of property (*Howard v. Schaniel, supra*, at p. 264; *Smith v. Stuthman* (1947) 79 Cal.App.2d 708, 709 [181 P.2d 123]), which is ordinarily indicated by the loss of a particular sale, impaired marketability or depreciation in value (*Hill v. Allan, supra*, at p. 489; *Davis v. Wood* (1943) 61 Cal.App.2d 788, 797–798 [143 P.2d 740]).

" 'Pecuniary loss' " is an essential element of a slander of title cause of action. (*Manhattan Loft, LLC v. Mercury Liquors, Inc.* (2009) 173 Cal.App.4th 1040, 1057 [93 Cal.Rptr.3d 457]; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 646, p. 953.) This element is described in the Restatement Second of Torts, section 633, subdivision (1), as follows: "The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to [¶] (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and [¶] (b) *the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.*" (Italics added.) California courts have adopted the Restatement definition of pecuniary damage for purposes of a slander of title cause of action. (See *Appel v. Burman* (1984) 159 Cal.App.3d 1209, 1215 [206 Cal.Rptr. 259] (*Appel*); *Howard v. Schaniel, supra*, 113 Cal.App.3d at pp. 263–264 & fn. 2; *Glass v. Gulf Oil Corp.* (1970) 12 Cal.App.3d 412, 424 [96 Cal.Rptr. 902]; *Davis v. Wood, supra*, 61 Cal.App.2d at pp. 797–798; 5 Witkin, *supra*, Torts, § 646, p. 953.) Accordingly, it is well established that attorney fees and litigation costs are recoverable as pecuniary damages in slander of title causes of action when, as expressed in subdivision (1)(b) of section 633 of the Restatement, litigation is necessary "to remove the doubt cast" upon the vendibility or value of a plaintiff's property. (*Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 865 [237 Cal.Rptr. 282] [damages include "the expense of legal proceedings necessary to remove the doubt cast by the disparagement"]; *Forte v. Nolfi* (1972) 25 Cal.App.3d 656, 686 [102 Cal.Rptr. 455]; *Glass v. Gulf Oil Corp., supra*, at

Defendants argued that such evidence was merely theoretical and there was no showing that such theoretical or conjectural diminution in value ripened into actual pecuniary harm.

p. 437; *Contra Costa County Title Co. v. Waloff* (1960) 184 Cal.App.2d 59, 68 [7 Cal.Rptr. 358] [attorney fees and costs in legal action to clear slandered title are "special damages"]; *Wright v. Rogers* (1959) 172 Cal.App.2d 349, 366 [342 P.2d 447] ["the plaintiff may recover as damages the expense of legal proceedings necessary to remove a cloud on the plaintiff's title"]; *Davis v. Wood, supra,* at p. 798 [damages include the plaintiff's cost in clearing the title].)

■ Defendants do not dispute that attorney fees and litigation costs are a recoverable damage component in an otherwise valid slander of title cause of action. However, defendants contend that in order for attorney fees and costs to be recoverable as damages in a slander of title cause of action, there must *also* be pecuniary damage to the salability of the property itself. In other words, attorney fees and costs by themselves are not enough. Their argument seeks to place decisive emphasis on the comment in some of the cases that the thrust of the cause of action is protection from injury to the salability of property. (*Howard v. Schaniel, supra,* 113 Cal.App.3d at p. 264; *Smith v. Stuthman, supra,* 79 Cal.App.2d at p. 709.)[47] Defendants also rely on language in *Appel, supra,* 159 Cal.App.3d at page 1216, which, regarding the slander of title cause of action in that case, stated that "since damages were properly awarded in this case, attorneys fees are also a proper element of the damages." Defendants argue the quoted sentence confirms that before attorney fees may be awarded as damages, there *must first be* a finding of pecuniary damage relating to the salability of the property. We do not believe the wording in *Appel* is adequate to support the weight of defendants' proposition, particularly when the issue was not raised in that case. Rather, we agree with plaintiffs that the excerpted sentence is mere dicta and does not provide a definite answer to the question at hand. (See, e.g., *Styne v. Stevens* (2001) 26 Cal.4th 42, 57 [109 Cal.Rptr.2d 14, 26 P.3d 343] ["An opinion is not authority for a point not raised, considered, or resolved therein."].)

Although the issue raised by defendants has not been directly or specifically addressed in any California case, the basic principles and concepts discernable in the case law lead us to reject defendants' contention. We do not agree that a plaintiff must always show specific harm to vendibility, such as through proof of a lost sale or diminished value. Rather, we hold that at least in cases such as this one where title was disparaged in a *recorded* instrument, attorney fees and costs necessary to clear title or remove the doubt cast on it by defendant's falsehood are, by themselves, sufficient pecuniary damages for purposes of a cause of action for slander of title.

---

[47] We note that elsewhere the "gist" of the cause of action has been described as simply "the making of false statements disparaging one's title, done with malice . . . ." (*Contra Costa County Title Co. v. Waloff, supra,* 184 Cal.App.2d at p. 66.)

While it is true that an essential element of a cause of action for slander of title is that the plaintiff suffered pecuniary damage as a result of the disparagement of title (*Manhattan Loft, LLC v. Mercury Liquors, Inc., supra,* 173 Cal.App.4th at p. 1057), the law is equally clear that the expense of legal proceedings necessary to remove the doubt cast by the disparagement and to clear title is a recognized form of pecuniary damage in such cases (*Seeley v. Seymour, supra,* 190 Cal.App.3d at p. 865; *Wright v. Rogers, supra,* 172 Cal.App.2d at pp. 366–367; Rest.2d Torts, § 633, subd. (1)(b)).[48] Since California law expressly recognizes that attorney fees and costs are a form of pecuniary damages in slander of title cases, it would seem that in the absence of legal authority to the contrary, such damages are presumptively sufficient to satisfy the pecuniary damage element of the cause of action. No cogent authority to the contrary has been brought to our attention.

■ More than that, the rationale for allowing attorney fees as damages in slander of title cases supports the proposition that such damages are independently recoverable, and are not merely an add-on to other forms of pecuniary loss. That rationale may be articulated as follows: When a defendant's tortious conduct (i.e., the unprivileged publication of a falsehood constituting a slander of title) forces the plaintiff to litigate in order to clear his title, the plaintiff's attorney fees and costs necessary to accomplish that purpose constitute actual harm or injury to the plaintiff that was proximately caused by the tort and therefore should be compensated. (*Wright v. Rogers, supra,* 172 Cal.App.2d at p. 366; *Contra Costa County Title Co. v. Waloff, supra,* 184 Cal.App.2d at pp. 67–68.) In other words, allowing the recovery of attorney fees as damages in such cases is an application of the rule that a plaintiff is entitled to recover the amount of damages that will compensate for all the detriment proximately caused by the defendant's tortious conduct. (Civ. Code, § 3333; *Wright v. Rogers, supra,* at p. 365; *Forte v. Nolfi, supra,* 25 Cal.App.3d at p. 686; *Contra Costa County Title Co. v. Waloff, supra,* at pp. 67–68.) As aptly stated by the highest court of another state: "[A]ttorney fees are permissible as special damages in slander of title actions because 'the defendant . . . by intentional and calculated action leaves the plaintiff with only one course of action: that is, litigation. . . . Fairness requires the plaintiff to have some recourse against the intentional malicious acts of the defendant.' " (*Horgan v. Felton* (2007) 123 Nev. 577 [170 P.3d 982, 987–988], fn. omitted, quoting *Rorvig v. Douglas* (1994) 123 Wn.2d 854 [873 P.2d 492, 497].) In view of the above stated purposes for allowing recovery of fees as damages in slander of title causes of action, we see no reason to strictly limit

---

[48] When the Restatement of Torts defines the two recognized forms of pecuniary damage in slander of title cases, it does not suggest that the damage described in subdivision (b) is dependent upon the existence of the damage mentioned in subdivision (a). (Rest.2d Torts, § 633, subd. (1)(a) & (b).) It simply lists both as varieties of pecuniary damage that are recoverable in slander of title cases.

the recovery of such damages to those cases in which the plaintiff has also proven some *other* pecuniary harm, such as a lost sale, property depreciation or impairment of marketability.

In considering this issue, we believe it is helpful to note the analogy between a cause of action for slander of title and that of malicious prosecution. As one case put it, "[t]o clear a slandered title is akin to defending an unfounded lawsuit," since in both instances the defendant's tortious conduct was "calculated to result in litigation." (*Contra Costa County Title Co. v. Waloff, supra*, 184 Cal.App.2d at p. 68.) In both types of cases, the necessary attorney fees incurred are recoverable as special damages caused by the defendant's wrongful conduct. (*Ibid.*) Moreover, in malicious prosecution actions, the attorney fees and costs incurred in defending the frivolous suit may sometimes be the *only* special damages recovered by the plaintiff. (*Peebler v. Olds* (1945) 71 Cal.App.2d 382, 389 [162 P.2d 953].) Arguably the same should be true with respect to slander of title claims, since as the present appeal illustrates, the sole or primary damage sustained may be the fees incurred by the plaintiff to clear his title. As observed by another court: "In malicious prosecution, wrongful attachment, and slander of title, the defendants actually know their conduct forces the plaintiff to litigate," but aside from litigation expenses "actual damages are difficult to establish and often times are minimal in slander of title." (*Rorvig v. Douglas, supra*, 873 P.2d at p. 497.) Although there are differences between the two torts, we think the similarities are significant as they relate to this issue. Those similarities lend further support to the view we adopt herein.

Additionally, we note that courts in other jurisdictions have directly confronted this issue and have concluded that attorney fees incurred in removing the effects of slander of title are recoverable as special damages even in the absence of proof of an impairment of vendibility. For example, in *Paidar v. Hughes* (Minn. 2000) 615 N.W.2d 276, the only damages the plaintiff claimed were attorney fees incurred as a result of the defendant's slander of title. The Supreme Court of Minnesota held that the plaintiff could recover the fees as special damages: "Hughes does not claim a 'loss of sale' as his special damages; he claims attorney fees as his damages. The fact that Hughes ultimately was able to sell the property at issue here should not prevent him from recovering his attorney fees if he can show that he necessarily incurred them as a direct result of [the defendant's] tortious actions." (*Id.* at p. 281.) Likewise, in *Colquhoun v. Webber* (Me. 1996) 684 A.2d 405, the defendant argued that the plaintiffs' failure to allege and prove a specific lost sale as a result of the defendant's filing a frivolous deed was fatal to the plaintiffs' slander of title claim. The Supreme Court of Maine rejected that argument and held that "attorney fees incurred in removal of a cloud on a title caused by a spurious and vexatious deed do constitute proof

of special damages in a slander of title action even in the absence of proof of an impairment of vendibility." (*Id.* at p. 411.) We concur with the reasoning of these courts.

■ Defendants' main objection is that such a result would overthrow the American rule regarding recovery of attorney fees, as set forth in Code of Civil Procedure section 1021. We disagree with that assertion, since what we are dealing with here (as in the case of malicious prosecution) is a tort in which the case law has deemed such attorney fees and costs to be a form of special damages flowing from the defendant's tortious conduct. (*Contra Costa County Title Co. v. Waloff, supra*, 184 Cal.App.2d at p. 67.) An award of fees *as damages* is distinguishable from an award of fees *as fees*, and only the latter is directly covered by section 1021. (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816–818 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*); *Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 621 [30 Cal.Rptr. 821, 381 P.2d 645] [such cases are "not dealing with 'the measure and mode of compensation of attorneys' but with damages wrongfully caused by [the] defendant's improper actions"].) Allowing fees as the sole pecuniary damage in slander of title cases would not overthrow the American rule, just as it has not done so in malicious prosecution cases.

Finally, we observe that all the reasons elaborated above in support of allowing recovery in the present case are *especially compelling* when it is considered that the slander of title here was by a *recorded* document. Where a defendant slanders title by means of a recorded instrument, thereby publishing in the chain of title a false and disparaging view of the nature of the plaintiff's right or interest in the land, the plaintiff is obviously put in a position where his only viable recourse is to bring suit to clear his title of the recorded falsehood. And, as one court emphasized, a recorded slander of title has a continuing negative impact until corrected: " '[I]n the instant case the libel was recorded in the office of the county recorder where the land was situate and *constituted a continuing, permanent notice to the world* that a judgment lien . . . rested upon respondent's real property. [The recorded libel] was communicated to the entire purchasing public.' " (*Coley v. Hecker* (1928) 206 Cal. 22, 29 [272 P. 1045], italics added.) The fact that the Notice of Permission was a recorded instrument in the chain of title decidedly weighs in favor of allowing recovery of fees alone as damages.

■ Although we have made some comments of a general nature in our discussion of this matter, our decision relates only to the particular facts of this case. Applying the reasoning discussed at length above, we hold that at least in cases involving a recorded slander of title (as here), the expenses incurred by plaintiffs in the form of attorney fees and costs to clear title and remove the doubt cast upon their property rights by the recorded falsehood

are sufficient special damages to support the cause of action; no other pecuniary damages need be shown. (See, e.g., *Arthur v. Davis* (1981) 126 Cal.App.3d 684, 690–691 [178 Cal.Rptr. 920] [attorney fees to clear title were acknowledged as the sole pecuniary damage in slander of title cause of action based on a recorded false deed].)[49] Therefore, the trial court correctly allowed the jury to award those damages in the present case, even though no special damage to salability of the property was found.

### C.   *Apportionment of Fees*

Alternatively, defendants ask for a new trial on the damages that were awarded for slander of title, claiming that the trial court prejudicially erred in instructing the jury on the question of apportionment of fees and in allowing experts to testify on that issue.[50] We disagree.

At the time the case was tried, plaintiffs as well as defendants had pending causes of action for slander of title. The trial court instructed the jury on the law as it applied to *both* sides' claims for attorney fees as damages for slander of title. Specifically, the trial court informed the jury that attorney fees and litigation costs necessary to clear a slandered title were recoverable as to the slander of title cause of action, but added that attorney fees and costs were not recoverable regarding other causes of action. The trial court further instructed the jury: "However, attorney's fees and litigation costs need not be apportioned when incurred for representation on an issue common to both a cause of action for which attorney's fees and costs are awardable and for which they are not allowed. [¶] If you find that non-fee claims are inexplicably interrelated with fee claims, you may award attorney's fees and costs incurred in connection with those inextricably related claims."

That instruction was based on the well-established general rules regarding apportionment of fees. As was stated in *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124 [158 Cal.Rptr. 1, 599 P.2d 83] (*Reynolds*) at pages 129 to 130: "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees

---

[49] We realize the precise issue on appeal in *Arthur v. Davis, supra*, 126 Cal.App.3d 684 was the accrual of the cause of action for purposes of the statute of limitations. Still, the case presents at least a de facto example of a slander of title cause of action that was upheld with explicit acknowledgment by the Court of Appeal that the sole damages were attorney fees. (*Id.* at p. 689, fn. 3.) If the proposition argued by defendants herein were correct, there would have been no need in *Arthur v. Davis* to bother with a lengthy statute of limitations discussion as it would have been obvious that no cause of action existed.

[50] Although fee issues are usually addressed to the trial court in the form of a posttrial motion, fees as damages are pleaded and proved by the party claiming them and are decided by the jury unless the parties stipulate to a posttrial procedure. (*Brandt, supra*, 37 Cal.3d at p. 819.)

are proper and one in which they are not allowed." (See also *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 [98 Cal.Rptr.2d 263] [apportionment not required when claims for relief are "so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units"]; *Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493 [209 Cal.Rptr. 623] ["Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories."].)

On appeal, defendants argue it was error for the trial court to instruct the jury that fees need not be apportioned where the claims and issues were inextricably intertwined. Apparently, defendants' position is that the principles of apportionment set forth in cases such as *Reynolds* do not apply to this case. In support, defendants rely on *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 805–813 [16 Cal.Rptr.3d 374, 94 P.3d 513] (*Cassim*) for the proposition that whenever attorney fees are awarded as damages, there *must* be an apportionment or allocation as a matter of law. But *Cassim* is not authority for such a broad proposition. That case involved an insured's action for tortious breach of good faith and fair dealing in which, pursuant to a prior decision of the Supreme Court, the recoverable amount of fees as damages could not exceed " 'the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract' " such that " '[f]ees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable.' " (*Id.* at p. 807, italics omitted, quoting *Brandt, supra,* 37 Cal.3d at p. 819.) Applying the narrow scope and purpose of *Brandt* fees, *Cassim* held that even when there was overlap between the tort and contract claims, apportionment was necessary. (*Cassim, supra,* at pp. 811–812.) The court then provided a method or formula for the calculation of such fees in instances where the attorney was retained on a contingency fee basis. (*Id.* at p. 812.)

We believe that *Cassim* is distinguishable. It addressed the special setting of *Brandt* fees where the insurance policy rights being vindicated— and concerning which fees as damages were available—were inherently narrower than the entire scope of the litigation entailing both tort and contract claims. Therefore, to effectuate the limited purpose of *Brandt* fees, *Cassim* held that apportionment or allocation was required to ensure the plaintiff only received fees for a particular portion of the overall case. (*Cassim, supra,* 33 Cal.4th at pp. 807–813.) In slander of title cases, the nature of the property rights and interests at stake, and concerning which the plaintiff has been forced to litigate, may differ on a case-by-case basis. In some cases, the slander of title issues may be sufficiently broad that resolution of those issues would be inseparable from other issues and claims that arose in the same litigation. That appears to be the basis on which the issue was decided in the

present case. We conclude *Cassim* is distinguishable and, therefore, the trial court correctly instructed the jury.

Moreover, to the extent defendants are attempting to argue that the jury's results with respect to fees as damages and apportionment were not supported by the record in this case, defendants have failed to meet their burden of cogently explaining their position with specific citation to the record below. We disregard a claim of error made without meaningful analysis or citation to the record. (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534 [115 Cal.Rptr.3d 42] ["It is not our place to comb the record seeking support for assertions parties fail to substantiate."].)

During the trial, both sides had attorneys testify as expert witnesses on the issue of the portion of attorney fees attributable to slander of title, and the extent to which such fees should, or should not, be apportioned. The fees in question were those incurred by plaintiffs in the first phase of the case—that is, the court trial. Plaintiffs' expert, Jerry Mann, explained that segregation or allocation of fees between compensable and noncompensable claims is not required when the issues are inextricably interrelated and common questions exist, which make apportionment impracticable. Thus, plaintiffs' expert did not misstate the law to the jury. Mann went on to provide his opinion that the fees incurred need not be apportioned in this case, since in his assessment all of the fees were inextricably part of the same common issues of plaintiffs' right to river access and to maintain a private, gated subdivision. These two ultimate issues, which were integral to the slander of title claim, permeated the entire phase one of the litigation. David Gilmore testified for defendants; his opinion was that the fees were not inextricably interrelated, but rather could be segregated and apportioned and he concluded that plaintiffs should receive only 10 percent of the total fees they incurred. In closing arguments, defendants' attorneys acknowledged the concept of inextricably interrelated fees and referred to the conflicting testimony of the parties' expert attorneys. Defense counsel expressly invited the jury to award plaintiffs all of their fees if they accepted Mann's testimony.

To summarize, the jury was correctly instructed by the trial court concerning the law, both sides had the opportunity of presenting expert attorney testimony on the fee issue, and both sides did so. Plaintiffs' expert did not misstate the law or mislead the jury. There was extensive cross-examination of the fee experts, and in closing argument the parties' attorneys again referred to the evidence and argued their respective positions. Defendants have failed to explain why, as a matter of law, the trier of fact could not conclude on this record that the claims and issues were so inextricably intertwined that apportionment was not feasible. On balance, we conclude that defendants have failed to show a prejudicial error in regard to this matter of attorney fees as damages.

VI.  *Punitive Damages**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

On defendants' appeal, the trial court's order determining that the CC&R's apply to the Outlots is reversed. On plaintiffs' cross-appeal, the trial court's order determining road ownership is reversed. In all other respects, the judgment is affirmed. Costs associated with the appeal and cross-appeal are awarded to plaintiffs.[53]

Wiseman, Acting P. J., and Dawson, J., concurred.

A petition for a rehearing was denied May 30, 2012, and the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied July 18, 2012, S203258.

---

*See footnote, *ante*, page 999.

[53] The Association's request for judicial notice of Rio Mesa's second amended complaint in Madera Superior Court case No. MCV040451, entitled *Rio Mesa v. Sumner Peck Ranch* is granted. The Association's request for judicial notice of the Internet video record of the Madera County Board of Supervisors meeting on July 12, 2011, is denied. Defendants' request for judicial notice filed March 19, 2012, is granted.